[No. 48248-9.   En Banc.   September 5, 1985.]

The State of Washington, *Respondent,* v. Pompeyo Benito Guloy, Jr., et al, *Appellants.*

414

*Raymond H. Thoenig, James E. Lobsenz,* and *Mark W. Muenster* of *Washington Appellate Defender Association,* for appellant Guloy.

*James V. Grubb,* for appellant Ramil.

*Norm Maleng, Prosecuting Attorney, Deborah J. Phillips, Senior Appellate Attorney,* and *Roland Nikles, Deputy,* for respondent.

DORE, J.—We affirm the Ben Guloy and Jim Ramil convictions of first degree aggravated murder.

## FACTS

On June 1, 1981, two members of the Cannery Workers Union, Gene Viernes and Silme Domingo, were shot at the union hall. Viernes was shot through the heart and died

immediately. Domingo, despite being shot four times, managed to stumble out of the union hall and call for help. A bus driver heard Domingo's cries and called Medic I. Huckins, a firefighter responding to the call, asked Domingo whether he knew who shot him. Domingo stated that he was shot by two Filipinos, Jim Ramil and Ben Guloy. Domingo repeated the names several times and even told another firefighter that Ramil's name had ended in an "l" and not an "o". On his deathbed in the hospital, Domingo again identified Ramil and Guloy as his assailants.

Rachael Kennedy saw Guloy, Tony Dictado, and Boy Peli (all belonging to a gang known as the Tulisan) in an alley that was next to the union hall an hour before the murders occurred. And Jaime Malebo testified that, immediately after seeing Domingo outside the union hall holding his stomach, he saw Ramil and Guloy walking in an alley that is next to the hall. Because Malebo knew them, he intended to get their attention. He hesitated, however, because both defendants were walking exceedingly fast.

The State presented evidence that defendants belonged to a group known as the Tulisan and that the Tulisan was involved in illegal gambling. The State's argument was that the murders of Viernes and Domingo were committed in order to advance the gambling conspiracy. The State showed that Tony Dictado[1] was the leader of the gang and that Dictado wanted to send two members of the gang to Alaska in order to gain control of gambling in that state. Because of new dispatch rules imposed by reformers in the cannery union, Dictado could not get members of Tulisan dispatched. Viernes and Domingo were members of the reform movement. Furthermore, Viernes was directly responsible for preventing Tulisan members from going to Alaska, as he was the dispatcher for the union.

---

[1]Tony Dictado was tried and convicted of aggravated first degree murder in a separate trial. We upheld the conviction in *State v. Dictado*, 102 Wn.2d 277, 687 P.2d 172 (1984).

The jury found defendants guilty of first degree aggravated murder. They now appeal to this court. Most of the issues presented by the defendants do not go to the question of whether defendants are guilty of first degree murder but rather whether such murders were aggravated. Four issues concern the aggravated first degree murder statute and its requirements; five question evidentiary and constitutional matters concerning admitted conspiracy evidence. The remaining claimed errors involve questions of speedy trial, expert testimony, jury sequestration, and jury instructions.

I

"AGGRAVATED" FIRST DEGREE MURDER

■ Defendants argue that the trial court committed four errors in its application of the aggravated first degree murder statute, RCW 10.95.020. The statute provides in pertinent part:

> A person is guilty of aggravated first degree murder if he or she commits first degree murder as defined by RCW 9A.32.030(1)(a), as now or hereafter amended, and one or more of the following aggravating circumstances exist: . . .
>
> (8) There was more than one victim and the murders were part of a common scheme or plan or the result of a single act of the person;

Defendants claim that the trial court interpreted the statute to require that murderers, not victims, be linked by a "common scheme or plan". If the trial court had interpreted the statute as defendants contend, then it would have erred. In *State v. Grisby*, 97 Wn.2d 493, 647 P.2d 6 (1982), *cert. denied*, 459 U.S. 1211 (1983), we held that "common scheme or plan" involves a nexus between the killings and not the killers. Here, the proof of conspiracy, while incidentally linking the defendants together, showed that there was a common scheme or plan involved in the murder of the victims. The victims were part of a union reform movement that was hindering the conspirators' efforts to send members to Alaska to further the illegal

gambling conspiracy. In order to facilitate the sending of Tulisan members to Alaska, the conspirators believed it was essential to eliminate Viernes and Domingo, so they arranged their murders.

### "COMMON SCHEME AND PLAN"

■ Defendants next argue that the trial court erred by not defining the phrase "common scheme or plan". If an element of a crime is not a matter of common understanding, then the trial court must define it for the jury. *State v. Davis*, 27 Wn. App. 498, 618 P.2d 1034 (1980). Commonly understood words require no definition. *Seattle v. Richard Bockman Land Corp.*, 8 Wn. App. 214, 505 P.2d 168 (1973). Whether words used in an instruction require definition is a matter of judgment to be exercised by the trial judge. *State v. Schimmelpfennig*, 92 Wn.2d 95, 594 P.2d 442 (1979).

While the trial court did not explicitly define the phrase, one of the instructions given by the court made it clear that the common scheme or plan requirement applied to the victims. In instruction 11, the court informed the jury that in order to find a defendant guilty, the jury must find that "*both* Gene Allen Viernes and Silme Domingo died . . . as a result of a common scheme or plan; . . ." (Italics ours.) Clerk's Papers, at 28. Even had the trial court not given such instruction, it would not have abused its discretion as the phrase "common scheme or plan" are words of common understanding. These words are found in daily use and are not technical nor were they used in any special legal sense.

■ Defendants further contend that the evidence was *insufficient* to show a common scheme or plan. They argue that there was no original plan to kill Domingo, but that he was killed to protect the identity of the defendants. The standard for determining whether the evidence was sufficient is whether, after viewing the evidence most favorable to the State, any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt. *State v. Green*, 94 Wn.2d 216, 616 P.2d 628 (1980).

There was evidence presented from which the jury could conclude that the murders of Viernes and Domingo were part of a common scheme or plan. They were both part of the reform movement in the union that was hindering the gambling conspiracy. They were also members of the executive board of the union that determined the union dispatch procedures which prevented Tulisan from sending members to Alaska. There was testimony that both Domingo and Viernes reviewed the dispatch procedures with the union's attorney. Domingo was a cofounder of the Rank and File Committee in the union, whose purpose was to reform certain old practices in the union and organize opposition to eroding union management. Finally, Ramil had called shortly before the murders took place and talked to Domingo. Thus, Ramil had good reason to suspect that Domingo would be present when Viernes would be killed. We hold that there was substantial evidence for any rational trier of fact to find that a common scheme or plan existed to kill both Viernes and Domingo.

Defendants' final argument regarding the aggravated murder statute deals with the alternative method, under RCW 10.95.020(8), of finding an aggravating circumstance. RCW 10.95.020(8) provides that an aggravating circumstance can be proved by showing that the murders were part of a common scheme or plan or *the result of a single act of the person*. Defendants assert that the trial court's instruction on what constitutes a single act was incorrect. The trial court instructed the jury as follows:

A "single act" means that the crimes alleged in Counts I and II are alleged to be part of a continuous transaction, and set in motion by a single unintermittent force.

Clerk's Papers, at 26. Defendants argue that this definition is too broad—that a "single act" is just that, a single act, and not a continuous transaction. They allege that multiple murders caused by a bomb or arson would come within the definition of a single act but not multiple murders committed by a person using a gun unless *one* bullet killed more than one person.

■ We have already read the term "single act" broadly enough to encompass multiple murders committed by a lone gunman. In *State v. Kincaid,* 103 Wn.2d 304, 692 P.2d 823 (1985), the defendant first killed his estranged wife's sister with a shotgun and then moments later killed his estranged wife. We held that both murders were the result of a single act. A reading of the aggravated murder statute supports our interpretation. Subsection (8) of RCW 10.95-.020 is the only section that takes into account the murder of more than one victim. Multiple murders are apt to occur in one of two ways. First, the murderer can have a plan to kill more than one person. Thus, multiple murders can be an aggravating circumstance even though not linked by time. Second, even though there is no plan involved, a murderer can kill more than one person in the course of a very short period of time involving one continuous act, *i.e.,* the present case.

We hold that the trial court's instruction on what constitutes a single act was correct. There is no valid reason for characterizing multiple murders that occur by bombing differently than those caused by consecutive gunshots.

## II
### Hearsay Statements in Conspiracy Cases

Defendants raise a number of issues pertaining to hearsay statements that were admitted under the coconspirator exception to the Rules of Evidence, ER 801(d)(2)(v). First, they note that the trial court failed to determine whether the evidence showed that they were members of the conspiracy to engage in illegal gambling. They point out that the trial court apparently felt that such a determination was to be made by the jury.[2] They assert that ER 104(a)[3]

---

[2] At the close of the State's case, defense counsel moved for a ruling striking all of the evidence regarding the gambling conspiracy on the grounds that

> the State has failed to prove by a preponderance of the evidence or otherwise that these individuals were participants in any scheme, plan or conspiracy to perpetrate the murders of Silme Domingo and Gene Viernes.

Report of Proceedings, at 2401. The trial judge denied the motion.

requires the trial judge to make an independent determination as to whether the evidence is sufficient. We agree.

In *State v. Dictado,* 102 Wn.2d 277, 687 P.2d 172 (1984), we held that before hearsay statements can be admitted under ER 801(d)(2)(v), the trial judge must find that there is evidence, other than the hearsay statements, that shows that the defendants were members of a conspiracy. If the trial court determines that there is sufficient evidence showing defendants were members of the conspiracy, then hearsay statements may be admitted if they satisfy the requirements of ER 801(d)(2)(v).

In making its independent determination, we hold that the trial court should use the preponderance of the evidence standard when deciding whether a defendant is a member of the conspiracy. This is the standard employed by many federal courts. *See, e.g., United States v. James,* 576 F.2d 1121 (5th Cir. 1978), *cert. denied,* 442 U.S. 917 (1979); *United States v. Santiago,* 582 F.2d 1128 (7th Cir. 1978). This standard is the proper one for a trial court to follow since ER 104(a) allows the trial court to use inadmissible evidence, as well as admissible and admitted proof in its determination.

Although the trial court failed in not making an independent determination of a conspiracy, we hold that the record here provides substantial evidence which shows that defendants were members of the conspiracy to promote illegal gambling. Many witnesses testified that the defendants were known Tulisan members who had worked at gambling houses for which Tulisan provided protection. In

THE COURT: That motion on behalf of both defendants is denied. That's a question of fact for a jury at this time.
Report of Proceedings, at 2401–02.

[3]ER 104(a) provides that
"Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of section (b). In making its determination it is not bound by the Rules of Evidence except those with respect to privileges."

addition, defendants were able to get dispatched immediately to another cannery after being fired from the Egegik cannery in Alaska even though such dispatching was not within union procedures. The undisputed evidence that the defendants were members of the conspiracy was the fact that they implemented one of its primary objectives: they murdered both victims. Defendants were specifically identified by the dying Domingo as being his assailants. They were seen fleeing the union hall immediately after the shootings. We hold that there was substantial evidence which showed, by a preponderance of the evidence, that defendants were members of the conspiracy.

▮▮ Defendants' claim that the trial court erred by not weighing the probative value of the gambling conspiracy evidence against its prejudicial impact as required by ER 403.[4] The defendants, however, never made an objection on that basis at trial. This court has "steadfastly adhered to the rule that a litigant cannot remain silent as to claimed error during trial and later, for the first time, urge objections thereto on appeal." *Bellevue Sch. Dist. 405 v. Lee,* 70 Wn.2d 947, 950, 425 P.2d 902 (1967). Moreover, the balancing test contemplated by ER 403 is left to the discretion of the trial court whose decision will not be overturned except for abuse. *State v. Valladares,* 31 Wn. App. 63, 639 P.2d 813 (1982), *aff'd in part, rev'd in part,* 99 Wn.2d 663, 664 P.2d 508 (1983). In *State v. Dictado,* 102 Wn.2d 277, 687 P.2d 172 (1984), we held that the trial court did not abuse its discretion by allowing in coconspirator statements in order to prove that a conspiracy existed. Accordingly, we reject defendants' contention.

Defendants' final evidentiary challenge to the admission of hearsay testimony is predicated on ER 801(d)(2)(v). They contend that the following four statements should not

---

[4]ER 403 provides that

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

have been admitted into evidence at trial:

(a) Dictado saying the statement, "Mother I'll get rid of you" where the subject of the statement was Viernes;

(b) Dictado's statement on May 31 that he was going to kill Viernes;

(c) Ramil's statement to San Pablo that Dictado said he was going to kill Viernes; and

(d) Boy Peli's post–murder statement concerning the use of a silencer, the test firing of the gun, and the motive for killing Domingo made to San Pablo while both were in Alaska.

All four hearsay statements were introduced through San Pablo.

ER 801(d)(2)(v) provides that a statement is not hearsay if it is made by a coconspirator of a party during the course and in furtherance of the conspiracy.

The State asserts that defendants' objections made at trial concerning the statements were not sufficiently specific and hence such objections were waived.

■ Regarding statements (a) and (d), we find that the objections made at trial were inadequate for purposes of an appeal. As to statement (a), counsel objected but did not state what his objection was based on. He merely said that he objected to what Dictado said. An objection which does not specify the particular ground upon which it is based is insufficient to preserve the question for appellate review. *State v. Boast,* 87 Wn.2d 447, 553 P.2d 1322 (1976). As to statement (d), counsel objected but on the basis that it was not proper impeachment nor was it within the scope of redirect. A party may only assign error in the appellate court on the specific ground of the evidentiary objection made at trial. *State v. Boast, supra.* Since the specific objection made at trial is not the basis the defendants are arguing before this court, they have lost their opportunity for review.

As to statements (b) and (c), counsel requested and was allowed a continuing objection:

MR. GRUBB: Your Honor, I would like to have a continuing objection to this line of inquiry because it calls

for blatant hearsay from what Tony Dictado is supposed to have said.

MISS MAIDA: It's an exception to the hearsay rule, your Honor.

MR. GRUBB: None that I know of.

THE COURT: The objection's overruled, and a continuing one will be allowed as to what was said by others other than the defendants in this phase of the testimony.

Report of Proceedings, at 1552. This objection, while not ideal, is sufficiently specific so as to allow the defendants the opportunity to have this court review the issue.

We find that the trial court properly admitted statements (b) and (c) under the coconspirator exception, ER 801(d)(2)(v). Both statements were made during the pendency of the conspiracy. The conspiracy started before the murders occurred and long before the statements were made. The conspiracy had been in existence since the time Tulisan had been involved in promoting illegal gambling in Alaska. The conspiracy did not end with the killing of Viernes and Domingo. Instead, it was in existence until at least the time Boy Peli went to Alaska and asked San Pablo to pay a $1,500 gambling commission. Further, both statements were made in furtherance of the conspiracy. Such statements were made to San Pablo in order to prove to him that Tulisan would be able to send its members to Alaska to run the gambling operation.

In summary, we find that defendants waived their opportunity to contest the admission of statements (a) and (d). No objection was made to statement (a) and an objection not based on hearsay was made as to statement (d). As to statements (b) and (c), we find that both statements were made during the pendency of the conspiracy and, hence, were admissible under the coconspirator exception to the hearsay prohibition.

## SIXTH AMENDMENT RIGHTS

Defendants' final objection to the admission of hearsay is a constitutional one. They claim that they were denied their right of confrontation.

Dictado was initially a witness for the State. While on the stand, the State never questioned him about the alleged statements that he made which San Pablo heard.[5] Instead, the State had San Pablo relate Dictado's statements when San Pablo testified 6 days later.

Dictado was apparently willing to testify on direct examination for the defendants later on in the trial. However, while the State was presenting its case in chief, Dictado was arrested for the murder of Viernes and Domingo. Dictado's arrest took place after San Pablo had testified. After his arrest, Dictado invoked his right not to incriminate himself and refused to testify for the defendants.

█ A hearsay statement, even though admissible under the rules of evidence, may still violate the defendant's right of confrontation. *California v. Green,* 399 U.S. 149, 26 L. Ed. 2d 489, 90 S. Ct. 1930 (1970).[6] However, the United States Supreme Court has stated that "the Confrontation Clause is not violated by admitting a declarant's out-of-court statements, as long as the declarant is testifying as a witness and subject to full and effective cross-examination". *Green,* at 158. Here, the declarant (Dictado) took the stand and testified. However, the record before us does not contain the witness' verbatim statements given to the defendants under CrR 4.7. Thus, we do not know whether

---

[5]The first statement was made on May 26 when Dictado said: "Mother, I'll get rid of you." Dictado made this statement after having an argument with Viernes in a Filipino dialect which Viernes did not understand. The second statement was made on May 31 at the Luna Cafe where Dictado told San Pablo that he was going to kill Viernes.

[6]The United States Supreme Court has stated in *California v. Green,* 399 U.S. 149, 155–56, 26 L. Ed. 2d 489, 90 S. Ct. 1930 (1970): "While it may readily be conceded that hearsay rules and the Confrontation Clause are generally designed to protect similar values, it is quite a different thing to suggest that the overlap is complete and that the Confrontation Clause is nothing more or less than a codification of the rules of hearsay and their exceptions as they existed historically at common law. Our decisions have never established such a congruence; indeed, we have more than once found a violation of confrontation values even though the statements in issue were admitted under an arguably recognized hearsay exception."

the defendants knew that San Pablo was going to testify about Dictado's threats.

The State argues that under *Ohio v. Roberts,* 448 U.S. 56, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980) it was permissible for it to have San Pablo introduce Dictado's statements. In *Roberts,* the Court held that a declarant's out–of–court statements are admissible if the declarant is unavailable to testify at trial and the statements bear sufficient indicia of reliability. Here, Dictado was available at the time the State had San Pablo testify. Thus Dictado, and not San Pablo, should have introduced the statements. This would have provided the defendants an opportunity to fully and effectively question Dictado concerning his statements that he intended to kill Viernes.

Since the defendants did not have the opportunity to fully and effectively cross–examine Dictado while he was on the stand and since they were deprived of their opportunity to later cross–examine him because he was arrested and invoked his right not to incriminate himself, we hold that defendants were denied their right of confrontation.

However, in light of the other overwhelming evidence of the defendants' guilt, we find this error to be harmless. It is well established that constitutional errors, including violations of a defendant's rights under the confrontation clause, may be so insignificant as to be harmless. *Harrington v. California,* 395 U.S. 250, 251–52, 23 L. Ed. 2d 284, 89 S. Ct. 1726 (1969); *Chapman v. California,* 386 U.S. 18, 21, 17 L. Ed. 2d 705, 87 S. Ct. 824, 24 A.L.R.3d 1065, *reh'g denied,* 386 U.S. 987 (1967). A constitutional error is harmless if the appellate court is convinced beyond a reasonable doubt that any reasonable jury would have reached the same result in the absence of the error. Constitutional error is presumed to be prejudicial and the State bears the burden of proving that the error was harmless. *State v. Stephens,* 93 Wn.2d 186, 190–91, 607 P.2d 304 (1980).

We take this opportunity to settle the question of what type of standard this court will use in its harmless error

analysis. Courts currently use either the "contribution" test or the "overwhelming untainted evidence" test in their analysis. *See State v. Evans,* 96 Wn.2d 1, 633 P.2d 83 (1981) (Brachtenbach, J., concurring). Under the "contribution" test, an appellate court looks only at the tainted evidence to determine if that evidence could have contributed to the fact finder's determination of guilt. If so, reversal is required. *See, e.g., Bumper v. North Carolina,* 391 U.S. 543, 550, 20 L. Ed. 2d 797, 88 S. Ct. 1788 (1968); *Price v. Georgia,* 398 U.S. 323, 331, 26 L. Ed. 2d 300, 90 S. Ct. 1757 (1970). Under the "overwhelming untainted evidence" test, the appellate court looks only at the untainted evidence to determine if the untainted evidence is so overwhelming that it necessarily leads to a finding of guilt. *See, e.g., Parker v. Randolph,* 442 U.S. 62, 70–71, 60 L. Ed. 2d 713, 99 S. Ct. 2132 (1979); *Brown v. United States,* 411 U.S. 223, 231, 36 L. Ed. 2d 208, 93 S. Ct. 1565 (1973). We believe the latter test provides the better analysis. The "overwhelming untainted evidence" test allows the appellate court to avoid reversal on merely technical or academic grounds while insuring that a conviction will be reversed where there is any reasonable possibility that the use of inadmissible evidence was necessary to reach a guilty verdict.

Here, given the overwhelming amount and credibility of the properly admitted evidence, we find that the exclusion of two out–of–court statements by Dictado would not have resulted in a different verdict.

### III
#### RIGHT TO A SPEEDY TRIAL

Defendants allege that they were denied a speedy trial pursuant to CrR 3.3.[7]

---

[7]Defendant Ramil also asserts that the trial court's decision to admit evidence of a gambling conspiracy denied the defendants due process. Apparently his brief was written before we issued our decision in *State v. Dictado,* 102 Wn.2d 277, 687 P.2d 172 (1984) wherein we held that a defendant's right of due process is not violated when conspiracy evidence is admitted even though charges of conspiracy

Defendants were first brought for arraignment on June 4, 1981. At that time, the State requested a continuance so that the defendants could be placed in a lineup prior to arraignment. Six days later, on June 10, the defendants were arraigned on charges of first degree murder. On July 16, the initial trial date of August 9 was moved ahead to July 30. On July 28, the State disclosed the names of six additional prosecution witnesses to the defense. On July 30, counsel for defendant Guloy requested a 5–day continuance because of the disclosure 2 days earlier of the six additional witnesses. Counsel for defendant Ramil did not request a continuance. The trial court continued the trial for 11 days instead of the 5 requested by Guloy. The trial date was set for August 10.

Defendants contend that June 4, the day the defendants were first brought for arraignment but were not actually arraigned, and not June 10, the actual date of arraignment, should be used for purposes of calculating the starting date for the right of speedy trial under CrR 3.3.[8] Defendants argue that the reason for the delay, the State's desire to hold a lineup, was not sufficient to justify the delay. Thus, they claim they should have been arraigned on June 4. Yet CrR 3.3(c)(1) only states that the defendant must be arraigned within 14 days of the filing of the information. It does not require that the defendant be arraigned as soon as possible. Further, the rule provides that the defendant

---

have not been filed against a defendant. Since we dispositively answered this question in *Dictado,* we will not repeat our analysis here.

[8]CrR 3.3(c)(1) provides:

"If the defendant is detained in jail or subject to conditions of release, the defendant shall be arraigned not later than 14 days after the date the information or indictment is filed directly in superior court. If the defendant is not detained in jail or subjected to conditions of release, the defendant shall be arraigned not later than 14 days after that appearance in superior court which next follows the filing of the information or indictment. A defendant not released from jail pending trial shall be brought to trial not later than 60 days after the date of arraignment. A defendant released from jail whether or not subjected to conditions of release pending trial shall be brought to trial not later than 90 days after the date of arraignment."

must be brought to trial within 60 days of arraignment and not 60 days from when a defendant could have possibly been arraigned. Consequently, we find that the 60–day period started on June 10, the date of the arraignment.

Counting from June 10, 61 days had passed before the trial commenced on August 10. Defendants point out that CrR 3.3 requires that a defendant in their situation be brought to trial within 60 days. Thus, they argue, according to CrR 3.3(i), the charges against them should have been dismissed with prejudice. These are not, however, the only facts. On July 30, the day trial was supposed to start, Guloy requested a 5–day continuance, because 2 days prior to July 30, the State released the names of six more witnesses it planned to call at trial. Ramil, on the other hand, did not want a continuance. The trial court was faced with a dilemma. If it granted both defendants' requests, then Guloy would be deprived of his right to a speedy trial since he would have to wait until the State had finished trying Ramil. If it forced both defendants to go to trial as scheduled, then Guloy would not have had an adequate opportunity to prepare his case. Consequently, the trial court compromised: it continued the trial until the 10th. In this way, Guloy could prepare his defense while Ramil would suffer only a minor inconvenience of a few days of delay. While the amount of time was increased to 61 days from the date of arraignment, we hold that under these facts this is permissible. We further hold that under CrR 3.3(h)(2), the State, the court, or a party may move for, and the court may grant a continuance when the administration of justice requires it and a defendant will not be *substantially* prejudiced in the presentation of his defense.

Defendants' second contention is that the trial court was required, because of pretrial publicity, to sequester the jury. Pretrial publicity is irrelevant to the determination of whether or not the jury should be sequestered. *See State v. Wixon,* 30 Wn. App. 63, 631 P.2d 1033 (1981). The purpose of sequestration is to protect jurors from outside influence during the course of a trial which might

affect their verdict. *State v. Wixon, supra.* While it is true that this trial received a lot of publicity during the proceedings, so would any murder trial. Defendants did not show how the publicity here was different from publicity during any murder trial. Nor did they show how or if the jury was influenced by such publicity. Consequently, we hold that the trial court did not abuse its discretion in not sequestering the jury.

### Dr. Loftus

Defendants next assert that they should have been allowed to have an expert witness, Dr. Loftus, testify as to factors which can make eyewitness identification unreliable at times. After the trial court denied defendants' request, it allowed them to submit for the record an 11–page affidavit outlining Loftus' proposed testimony. The affidavit showed that Loftus would have testified to the following. That perception and memory recall become less reliable as the subject experiences greater stress. Thus, dying declarations are much less reliable than laymen tend to think. Second, where a weapon is involved, the witness or victim tends to focus on the weapon and not the assailant. Third, if a person expects to see a particular person in a particular place, those expectations can influence the person's perceptions. Finally, people generally are less able to identify persons of another race. Defendants intended to use this testimony to discredit Domingo's dying declarations naming them as his assailants. They also wanted to use it to argue that the non–Filipino eyewitnesses had misidentified them. Defendants argue that Loftus' testimony should have been admitted under ER 702 which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

The decision whether to admit or exclude opinion evidence is within the discretion of the trial court. *State v.*

*Cook,* 31 Wn. App. 165, 639 P.2d 863 (1982). As long as the trial court does not abuse its discretion in deciding whether to admit expert testimony concerning eyewitness identification, we will not overturn its decision. The eyewitness identification, while important, was not the only evidence that inculpated the defendants. The most damaging evidence was Domingo's statement that the defendants had been his assailants. Dr. Loftus' testimony would not have affected the reliability of Domingo's statement because her testimony only concerns the identification of strangers. Domingo knew both his assailants and, thus, there would be little chance of misidentification. Moreover, her testimony concerning identification of someone of another race would not have been helpful as both witnesses who saw the defendants outside the union hall before and after the shootings were Filipino. Consequently, we find no abuse of discretion in the trial court's decision.

## Jury Misconduct

During the fifth week of the trial, jail security personnel discovered that juror number 2, Mr. Blazek, had attempted to bring a pistol into the jury room after the noontime recess. Blazek testified that he did not buy the gun because he feared the defendants. Nor did he buy it in order to do some independent research. Instead, being a collector of guns, he had been shopping for this particular pistol during the lunch recesses. Upon finding it, he purchased it during a lunch recess and brought it back with him to the jury room. The pistol was at all times unloaded. Counsel for defendant Guloy asked the court for a mistrial. Counsel for defendant Ramil did not ask for a mistrial but only asked that the juror be replaced. The juror was replaced. There was no abuse of discretion. *State v. Wright,* 12 Wn. App. 585, 530 P.2d 704 (1975).

## Jury Instruction on "Intentionally"

Finally, the defendants contend that the trial court erred in not instructing the jury that an accomplice to murder must act "intentionally".

RCW 9A.08.020(3)(a) provides that

A person is an accomplice of another person in the commission of a crime if:
(a) With knowledge that it will promote or facilitate the commission of the crime, he
(i) solicits, commands, encourages, or requests such other person to commit it; or
(ii) aids or agrees to aid such other person in planning or committing it; . . .

The trial court's instructions to the jury concerning accomplice liability included the above statutory language.

▮▮▮ Defendants assert that, in order to convict an accomplice for aggravated murder, the State must show that the accomplice had the intent that the victim would be killed. The statute has no such requirement. Moreover, our Court of Appeals has recently addressed this same question where the trial court gave the same instructions:

RCW 9A.08.020(3)(a) states that an accomplice is one who aids a principal: "[w]ith *knowledge* that it will promote or facilitate the commission of the crime . . ." (Italics ours.) The accomplice statute implicitly demonstrates that the State need not prove that the principal and accomplice share the same mental state. There was no error as to the instruction concerning the mental state of the accomplice.

*State v. Bockman*, 37 Wn. App. 474, 491, 682 P.2d 925 (1984). We agree with the Court of Appeals and uphold the trial court's instructions.

We affirm the murder convictions of Jim Ramil and Ben Guloy.

DOLLIVER, C.J., and UTTER, ANDERSEN, CALLOW, and DURHAM, JJ., concur.

BRACHTENBACH, J. (concurring)—I agree with the majority's analysis, including its adoption of the "overwhelming untainted evidence" test to determine if constitutional error is harmless. However, in adopting this test, I carefully distinguish those situations in which constitutional error may never be harmless. There are some constitutional vio-

lations which undermine the fundamental fairness of the judicial process to such an extent that they require automatic reversal. *Rose v. Lundy,* 455 U.S. 509, 543–44, 71 L. Ed. 2d 379, 102 S. Ct. 1198 (1982) (Stevens, J., dissenting). Such errors include the admission of an involuntary confession, *Mincey v. Arizona,* 437 U.S. 385, 398, 57 L. Ed. 2d 290, 98 S. Ct. 2408 (1978); *Payne v. Arkansas,* 356 U.S. 560, 567–68, 2 L. Ed. 2d 975, 78 S. Ct. 844 (1958) and the knowing use by the prosecutor of perjured testimony, *Mooney v. Holohan,* 294 U.S. 103, 112, 79 L. Ed. 791, 55 S. Ct. 340, 98 A.L.R. 406 (1935). Other constitutional errors potentially affect a trial in such a way that it is impossible for an appellate court to later evaluate the error to determine whether or not it was harmless. This type of error includes the failure to provide counsel for an indigent defendant, *Gideon v. Wainwright,* 372 U.S. 335, 344, 9 L. Ed. 2d 799, 83 S. Ct. 792, 93 A.L.R.2d 733 (1963); *White v. Maryland,* 373 U.S. 59, 60, 10 L. Ed. 2d 193, 83 S. Ct. 1050 (1963); the failure to determine that a defendant is competent to stand trial, *Pate v. Robinson,* 383 U.S. 375, 387, 15 L. Ed. 2d 815, 86 S. Ct. 836 (1966); discrimination in the selection of a jury, *Whitus v. Georgia,* 385 U.S. 545, 17 L. Ed. 2d 599, 87 S. Ct. 643 (1967); and financial interest by a judge in the outcome of a trial, *Tumey v. Ohio,* 273 U.S. 510, 532, 71 L. Ed. 749, 47 S. Ct. 437, 50 A.L.R. 1243 (1927). An appellate court can only speculate as to how the trial or the fact finder's perception of the trial would have differed had such constitutional errors not occurred. However, the admission of inadmissible evidence is not among the constitutional errors which the court must always find to be prejudicial. The court is ordinarily in a position to judge the possible effect of admitting a particular piece of evidence within the context of all the evidence presented at trial. *Rushen v. Spain,* 464 U.S. 114, 128 n.7, 78 L. Ed. 2d 267, 104 S. Ct. 453 (1983) (Stevens, J., concurring).

UTTER, PEARSON, and ANDERSEN, JJ., concur with BRACHTENBACH, J.

GOODLOE, J. (concurring in part, dissenting in part)—I agree with all of the majority opinion, except that section addressing the defendants' right to a speedy trial. I would hold the defendants were denied a speedy trial under CrR 3.3.

CrR 3.3(i) provides:

**(i) Dismissal With Prejudice.** A criminal charge not brought to trial within the time period provided by this rule shall be dismissed with prejudice.

The time period provided in the rule for defendants, in the position of Ramil and Guloy, who are not released from jail pending trial, is not later than 60 days after the date of arraignment. CrR 3.3(c)(1). As directed in CrR 3.3(a), "[i]t shall be the responsibility of the court to ensure a trial in accordance with this rule to each person charged with having committed a crime."

I agree with the majority that the 60–day period started on June 10, 1981. Majority opinion, at 428. However, even using this date, the defendants were not brought to trial within 60 days. The trial court was not faced with a dilemma. On July 30, defendant Guloy sought a *5–day* continuance. Had the requested 5–day continuance been granted, both defendants would have been brought to trial within the applicable 60–day speedy trial rule. Nothing in the record explains why a request for a 5–day continuance became an order for an 11–day continuance. The fact that it did violates the speedy trial rule.

I dissent from this section.