FILED
COURT OF APPEALS
DIVISION II

2014 DEC 16 AM 8:30

STATE OF WASHINGTON

BY_____
          DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 44052-1-II |
| Respondent, | UNPUBLISHED OPINION |
| v. | |
| SHERRY NIELSEN, | |
| Appellant. | |

BJORGEN, J. — Sherry Nielsen appeals her convictions of forgery and making a false statement to a public servant. Nielsen also appeals her exceptional sentence for her forgery conviction, based on a finding that the presumptive sentence was clearly too lenient in light of her long history of unscored misdemeanor offenses. She contends that her convictions must be reversed because the trial court erred in admitting statements she made to police officers before they administered the Miranda[1] advisements. She also challenges her exceptional sentence, arguing that the sentencing court violated her jury trial rights by increasing her punishment based on a fact not found by the jury.

---

[1] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

We reverse Nielsen's conviction for forgery, because the trial court did not determine whether the interrogating police officers denied her request to leave the room before she was advised of her *Miranda* rights. We also hold that the proper remedy is to remand for a new trial. We affirm Nielson's conviction for making a false statement to a public servant, because any error regarding that conviction was harmless beyond a reasonable doubt. Because we reverse the forgery conviction, we do not reach the challenge to the exceptional sentence imposed for that conviction.

## FACTS

In June 2011, Michael Miller received a bill for water service at a house he owned in the city of Vancouver. Miller had left the Vancouver house vacant, stopped making payments on it, and was negotiating with a bank to surrender a deed in lieu of foreclosure. When Miller contacted the Vancouver utilities department, he learned that his former tenant, Nielsen, had activated water service at the address. Miller informed city officials that Nielsen did not have permission to live at the house.

Vancouver police officer Ed Prentice visited the house and interviewed Nielsen. Nielsen told Prentice that she had permission from the bank to live at the house and showed him a 2008 rental agreement between her and Miller, as well as records of an online discussion with Miller concerning the possibility of Nielsen taking over the house. Prentice decided that he did not have sufficient basis to take further action and advised Miller to go through the usual eviction process.

Miller subsequently received a call from the Vancouver utilities department informing

him that Nielsen had again requested water service at the Vancouver house and presented various documents, including the documents described by Prentice and a 2012 lease agreement purportedly bearing Miller's signature. Miller called the Vancouver police and reported what had occurred, informing them that he had no such agreement with Nielsen and asking them to investigate.

After speaking with Miller and obtaining a copy of the documents Nielsen submitted to the utilities department, police officers James Watson and Bill O'Meara, in uniform, went to the house to contact Nielsen. A guest initially answered the door, but Nielsen, who wore a nightgown and, due to a recent surgery, an arm brace, eventually came to the door and let the officers in. Watson asked Nielsen's guest to leave and the two officers questioned Nielsen in the kitchen for about 15 to 30 minutes.

When confronted with Miller's accusation, Nielsen told Watson that she had lived at the house continuously since 2007 and produced the 2008 rental agreement. Watson demanded something more recent, and Nielsen produced the records of her online discussion with Miller. Watson testified at trial that at that point he administered the *Miranda* advisements to Nielsen. According to Watson's testimony, Nielsen continued to speak with the police officers, giving arguably inconsistent accounts of her residence at the house and answering some questions evasively. At that point, Watson testified that he placed Nielsen under arrest on suspicion of forgery, handcuffed her, and drove her to jail. Nielsen testified at the CrR 3.5 hearing that Watson did not read her the *Miranda* advisements until he arrested her.

At some point during the interview, Nielsen asked to leave so she could change into regular clothes, but the officers did not allow her to do so. Watson gave inconsistent testimony on this point at the CrR 3.5 hearing, first saying he told Nielsen she could not leave prior to

3

arresting her, then correcting himself and claiming that she did not ask to change clothes until after he placed her under arrest. Nielsen testified at the CrR 3.5 hearing that she "kept asking" if she could go, and "kept asking" if she could change clothes, but Watson refused. Verbatim Report of Proceedings (VRP) at 60. Nielsen also testified that she first requested to leave to change clothes about 10 minutes into the interview and that one of her requests occurred right before she was placed under arrest.

The State charged Nielsen with forgery and making a false or misleading statement to a public servant. On the forgery count, the State alleged as aggravating factors that Nielsen's "prior unscored misdemeanor or prior unscored foreign criminal history results in a presumptive sentence that is clearly too lenient," that Nielsen "has committed multiple current offenses and [her] high offender score results in some of the current offenses going unpunished," and that "[t]he failure to consider the [Nielsen's] prior criminal history, which was omitted from the offender score calculation . . . results in a presumptive sentence that is clearly too lenient." Clerk's Papers (CP) at 50-51.

Nielsen argued prior to trial that the aggravating factors raised factual issues that the trial court had to submit to the jury in a bifurcated procedure. The court declined to do so.

The jury returned guilty verdicts on both counts. The court ordered an exceptional sentence of 14 months, less time served, on the forgery count based on a finding that Nielsen's history of "prior unscored misdemeanor offenses results in a presumptive sentence that is clearly too lenient." CP at 136. The court sentenced Nielsen to 364 days, less time served, on the charge of making a false statement, and with 180 days suspended. Nielsen timely appeals.

## ANALYSIS

### I. CUSTODIAL INTERROGATION

Nielsen argues that the trial court erred in admitting statements she made before Watson administered the *Miranda* advisements, because she made the statements under custodial interrogation. We agree that the trial court erred in admitting those statements, but for different reasons.

After ruling on the admissibility of a statement a defendant made to police, a trial court must

> set forth in writing: (1) the undisputed facts; (2) the disputed facts; (3) conclusions as to the disputed facts; and (4) conclusion as to whether the statement is admissible and the reasons therefor.

CrR 3.5(c). We consider unchallenged findings of fact entered by a trial court after a CrR 3.5 hearing verities, but review de novo the trial court's conclusion as to whether a suspect was in custody. *State v. Lorenz*, 152 Wn.2d 22, 36, 93 P.3d 133 (2004).

A.    The Trial Court's Determination of Custody

A person questioned by law enforcement officers after being "taken into custody or otherwise deprived of his freedom of action in any significant way" must first "be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). If the warnings are not given, any statements elicited are inadmissible for certain purposes in a criminal trial. *Stansbury v. California*, 511 U.S. 318, 322, 114 S. Ct. 1526, 128 L. Ed. 2d 293 (1994).

The requirement that police administer *Miranda* warnings does not attach, however, until "there has been such a restriction on a person's freedom as to render him 'in custody.'" *Oregon*

5

*v. Mathiason*, 429 U.S. 492, 495, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977). Whether someone is in custody depends on all of the circumstances surrounding the interrogation, but "the ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125, 103 S. Ct. 3517, 77 L. Ed. 2d 1275 (1983) (quoting *Mathiason*, 429 U.S. at 495); *State v. Daniels*, 160 Wn.2d 256, 266, 156 P.3d 905 (2007).

In determining whether a suspect is "in custody," a court engages in an objective inquiry in the sense that it should not consider the "subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury*, 511 U.S. at 323. The United States Supreme Court has articulated the test as follows:

> "Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with formal arrest."

*J.D.B. v. North Carolina*, ___ U.S. ___, 131 S. Ct. 2394, 2402, 180 L. Ed. 2d 310 (2011) (quoting *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S. Ct. 457, 133 L. Ed. 2d 383 (1995)) (internal quotation marks, alteration, and footnote omitted). Thus, a reviewing court considers the situation from the suspect's point of view, but does not consider undisclosed contemporaneous beliefs of either the suspect or the officers about the nature of the interrogation.

In holding that the brief detention and questioning of a motorist did not amount to custodial interrogation, even though a motorist in such a situation is not free to leave, the United

States Supreme Court distinguished on two grounds such stops from the kind of police station interrogations that gave rise to the *Miranda* rule. *Berkemer v. McCarty*, 468 U.S. 420, 437-40, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984). First, the Court noted that "detention of a motorist pursuant to a traffic stop is presumptively temporary and brief," and, second, that "circumstances associated with the typical traffic stop are not such that the motorist feels completely at the mercy of the police . . . most importantly, [because] the typical traffic stop is public, at least to some degree." *Berkemer*, 468 U.S. at 438.

The fact that the interrogation takes place in the suspect's residence does not establish that the suspect was not in custody. *See Orozco v. Texas*, 394 U.S. 324, 89 S. Ct. 1095, 22 L. Ed. 2d 311 (1969) (suspect surrounded by four officers in his bedroom was in custody). In *State v. Dennis*, 16 Wn. App. 417, 558 P.2d 297 (1976), we held an interrogation custodial under circumstances similar but not identical to those presented here. One officer, invited into the apartment by one of the suspects, accused the suspects of possessing drugs and questioned them in their kitchen. *Dennis*, 16 Wn. App. at 419. Although the officer apparently told the suspects they were free to leave, one suspect testified that she asked the officer to go into the living room, but he refused. *Dennis*, 16 Wn. App. at 420. We held that "the atmosphere was . . . dominated by the officer's unwelcome presence and his insistence on remaining in a position where he could monitor and thus restrict the occupants' freedom of movement within their home." *Dennis*, 16 Wn. App. at 421-22.

Here, two uniformed officers confronted Nielsen and accused her of a crime. They asked Nielsen's guest to leave. At some point during the interview, Watson refused Nielsen's request to step into another room to change out of her night clothes. In these circumstances, Watson's denial of Nielsen's request to leave bears directly on whether a reasonable person would have

7

felt he or she was at liberty to terminate the interrogation and leave. Under *Thompson*, 516 U.S. at 112, the determination of when that occurred is material to determining when Nielsen was in custody.

As noted, after holding a hearing under CrR 3.5, the court is under a duty to

set forth in writing: (1) the undisputed facts; (2) the disputed facts; (3) conclusions as to the disputed facts; and (4) conclusion as to whether the statement is admissible and the reasons therefor.

CrR 3.5(c). A trial court's failure to comply with the duty to make a record imposed by CrR 3.5 amounts to error, "but such error is harmless if the court's oral findings are sufficient for appellate review." *State v. France*, 121 Wn. App. 394, 401, 88 P.3d 1003 (2004). Here, the trial court's oral ruling does not establish whether Nielsen asked to leave before Watson advised her under *Miranda*.

In its order on the CrR 3.5 hearing, the trial court listed the following as a disputed fact:

At some point during the interaction the defendant asked to change clothes and officer Watson told her she could not. The defendant testified this happened during the conversation in the kitchen. Officer Watson testified it happened after he placed the defendant under arrest and handcuffed her.

CP at 106. The order's conclusions did not mention these disputed circumstances or indicate whether it credited Watson over Nielsen on the timing of Nielsen's request to leave.

The conclusions of law, however, strongly signal that the court did not deem the request to leave to play any role in determining when custody began. The conclusions stated in full:

1. The defendant invited Officer Watson into her home to speak with her and Officer Watson told the defendant's friend to leave the kitchen while he spoke with the defendant. This action was not equivalent to a custodial arrest.
2. Therefore, the conversation between the defendant and Officer Watson did not amount to custodial interrogation.
3. The Court need not reach the issue of *Miranda* warnings and their application to custodial interrogation based on the above-findings and conclusions.

8

CP at 107.

Conclusions 1 and 2 plainly rely on only Nielsen's invitation to Watson and Watson's request that the friend leave in concluding that the interview was not a custodial interrogation. These conclusions do not imply that the court credited Watson's testimony over Nielsen's on the issue of the request to leave. Rather, they disclose the court's view that it was unnecessary to decide when Watson refused Nielsen's request to leave in determining when the situation became custodial. In this the trial court erred, since, as concluded above, the determination of when Watson refused Nielsen's request is material in determining when custody began. Because the court erred in omitting this material consideration in its determination of custody, it also erred in admitting Nielsen's statements from this interview.

B.    <u>Harmless Error</u>

Whether this error merits reversal is a separate question. The erroneous admission of statements obtained in violation of *Miranda* is subject to constitutional harmless error analysis: the "error is presumed to be prejudicial, and the State bears the burden of proving that the error was harmless." *State v. Nysta*, 168 Wn. App. 30, 43, 275 P.3d 1162 (2012), (citing *State v. Guloy*, 104 Wn.2d 412, 425, 705 P.2d 1182 (1985)), *review denied*, 177 Wn.2d 1008, 302 P.3d 180 (2013). A constitutional error is harmless "if the appellate court is convinced beyond a reasonable doubt that any reasonable jury would have reached the same result in the absence of the error." *Nysta*, 168 Wn. App. at 43 (citing *Guloy*, 104 Wn.2d at 425). If the "untainted evidence . . . is so overwhelming that it necessarily leads to a finding of guilt," the error does not warrant reversal. *Guloy*, 104 Wn.2d at 426.

   1. Forgery

Turning first to forgery, a necessary element of that offense is acting with intent to injure or defraud. RCW 9A.60.020. Nielsen argued that, while the State may have proved she submitted a fake rental agreement to the utilities department, she submitted it so that she would receive the bill in her name. Thus, Nielsen contended that the only intent the State had proved was her intent to take responsibility for the water bill herself, not intent to injure or defraud anyone.

In arguing that Nielsen acted with intent to injure or defraud, the State relied principally on evidence that Nielsen deceived both the utilities department and Miller in attempting to establish water service and remain at the house. However, the State then bolstered its argument by referring to the arguably evasive and inconsistent statements Nielsen made to Watson during the interview at the house. These statements had been introduced through Watson's trial testimony.

These arguably evasive and inconsistent statements by Nielsen, however, are among those which the court erred in admitting. Evidence tending to show evasiveness or contradictory statements in one setting may support a claim of fraudulent intent in another. At the least, we cannot say beyond a reasonable doubt that any reasonable jury would have reached the same result in the absence of the error. *Nysta*, 168 Wn. App. at 43. The error was not harmless in the forgery conviction.

2. False Statement

To commit the crime of making a false statement to a public servant, one must knowingly make a false or misleading material statement to a public servant. RCW 9A.76.175. The charging document expressly based this charge on Nielsen's statements the day that Prentice interviewed her, which occurred over two weeks before her interview with Watson. In its

closing argument about this offense, the State relied on Nielsen's statements to Prentice, but did not bring up the interview with Watson. Instead, the State's argument summarized strong, unambiguous evidence that Nielsen's statement that she was renting a room from Miller was false, that she knew it was false, and that it was material. The error in admitting statements from the interview with Watson was harmless beyond a reasonable doubt in its effect on the conviction of making a false statement to a public servant.

3. Remedy

In *State v. Bourgeois*, the court examined whether the erroneous admission of testimony required a new trial. 133 Wn.2d 389, 403, 945 P.2d 1120 (1997). The court held that an error in admitting evidence that does not result in prejudice to the defendant is not grounds for reversal. *Bourgeois*, 133 Wn.2d at 403 (citing *Brown v. Spokane County Fire Prot. Dist. No. 1*, 100 Wn.2d 188, 196, 668 P.2d 571 (1983)). The court looked to the harmless error test to determine prejudice. *Bourgeois*, 133 Wn.2d at 403.

Here, we hold that the trial court erred in admitting evidence of Nielsen's statements and that the error was not harmless under the proper standard. Therefore, consistently with *Bourgeois*, we reverse Nielsen's conviction of forgery and remand for a new trial.

## II. THE EXCEPTIONAL SENTENCE

Nielsen argues that whether a standard sentence is "clearly too lenient" under the RCW 9.94A.535(2)(b) aggravating factor is a factual determination for the jury. Br. of Appellant at 12-14. Nielsen's exceptional sentence, however, was imposed only on her forgery conviction. Because we reverse that conviction, we do not reach Nielsen's challenge to the exceptional sentence.

No. 44052-1-II

## CONCLUSION

We reverse the defendant's conviction for forgery and remand for a new trial on that charge. We affirm her conviction for making a false statement to a public servant.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

BJORGEN, A.C.J.

I concur:

MAXA, J.

12

LEE, J. (concurring in part/dissenting in part) — I concur with the majority in so far as the majority has determined that the trial court's written order on the CrR 3.5 hearing was erroneous. However, my concurrence is based exclusively on the trial court's violation of the plain language of CrR 3.5 by failing to set forth in writing its conclusion to the disputed fact of whether Nielsen asked to change clothes before or after she was placed under arrest by Officer Watson and read her *Miranda* warnings.

I dissent from the majority's determination that the error was not harmless as to the forgery conviction. Any error in the trial court's CrR 3.5 order was harmless because even if Nielsen's statements to Officer Watson were improperly admitted and excluded, I am convinced beyond a reasonable doubt that a jury would have found Nielsen guilty of the forgery charge based on the overwhelming untainted evidence. I would affirm Nielsen's convictions.

A.     TRIAL COURT'S WRITTEN CRR 3.5 ORDER

Under CrR 3.5 trial courts are required to enter a written order regarding the admissibility of a defendant's statements. Specifically, CrR 3.5(c) states:

> After the hearing, the court shall set forth in writing: (1) the undisputed facts; (2) the disputed facts; (3) conclusions as to the disputed facts; and (4) conclusion as to whether the statement is admissible and the reasons therefor.

Here, the trial court's order identifies disputed facts, including when Nielsen asked to change her clothes. However, the trial court never entered a conclusion resolving this disputed fact. Under the plain language of CrR 3.5(c), the trial court was required to enter a written finding or conclusion as to the facts that it identified as disputed. It did not. Therefore, in so far as the trial court's order violated the requirements of CrR 3.5, it was erroneous.

B.     HARMLESS ERROR

The majority concludes that Nielsen's statements to Officer Watson were improperly admitted and that the error was not harmless. Majority at 9-10. I respectfully disagree that the error was not harmless. The majority improperly focuses on the potential prejudice from the admission of the statements rather than on the strength of the other untainted evidence the State presented. Considering all the untainted evidence the State presented at trial, I am convinced beyond a reasonable doubt that, even if Nielsen's statements to Officer Watson were improperly admitted, any error was harmless.

Constitutional errors are harmless if the reviewing court is convinced beyond a reasonable doubt that any reasonable jury would have reached the same result in absence of the constitutional error. *State v. Guloy*, 104 Wn.2d 412, 425, 705 P.2d 1182 (1985), *cert. denied*, 475 U.S. 1020 (1986). We apply the "overwhelming untainted evidence" test to determine whether a constitutional error is harmless. *Guloy*, 104 Wn.2d at 426. "Under the 'overwhelming untainted evidence' test, the appellate court looks only at the untainted evidence to determine if the untainted evidence is so overwhelming that it necessarily leads to a finding of guilt." *Guloy*, 104 Wn.2d at 426.

Here, the majority asserts that the admission of Nielsen's statements to Officer Watson was not harmless because Nielsen's statements were "arguably evasive and inconsistent" and evidence "tending to show evasiveness or contradictory statements in one setting may support a claim of fraudulent intent in another." Majority at 10. But the salient question is not whether the improperly admitted evidence was prejudicial to the defendant or if the improperly admitted evidence may have gone toward proving an element of the State's case. Rather, when applying the constitutional harmless error standard, we must carefully examine all of the other evidence

14

presented at trial and determine whether the untainted evidence necessarily leads to a finding of guilt. In this case, I would conclude that even if Nielsen's statements to Officer Watson were improperly admitted, all of the State's other untainted evidence necessarily leads to a finding of guilt as to the forgery charge, rendering any error harmless.

At trial, Jamie Swenson, a customer service representative from the utility department, testified that Nielsen gave her documents allegedly showing that she was authorized to live in Miller's house. These documents included a copy of a 2008 rental agreement and an online conversation between Nielsen and Miller

Lisa Eruhow-Hagen, a senior customer service representative at the utilities department, also testified that Nielsen told her she was authorized to live in Miller's house. Nielsen presented Eruhow-Hagen with a copy of a 2008 rental agreement, an online conversation between Nielsen and Miller, and a 2012 rental agreement to support Nielsen's assertion that she was authorized to live in Miller's house.

Officer Edward Charles Prentice testified that, when he contacted Nielsen on June 11, 2012, Nielsen told him that she was renting the house. At first, Nielsen stated that she was not paying rent, but she later stated that she was paying rent to the bank. Officer Prentice also testified that Nielsen presented him with a 2008 rental agreement and an online conversation between Nielsen and Miller as proof that she was renting the house from Miller.

Miller testified that Nielsen moved out of the house in 2009. He also testified that the water had been shut off to the house since he moved out in 2011. When he was shown the 2008 rental agreement, the online conversation between Nielsen and himself, and the 2012 rental agreement, Miller testified that he had not seen or signed any of the documents.

15

To convict Nielsen of forgery, the State was required to prove that Nielsen (1) falsely made, completed or altered a written instrument or (2) possessed, uttered, disposed of, or put off as true a forged document. RCW 9A.60.020(1)(a), (b). The State must also prove that Nielsen acted with the intent to injure or defraud. RCW 9A.60.020(1).

Here, the untainted evidence demonstrates that Nielsen told two employees of the utilities department that she was authorized to live in Miller's house and that she supported her assertion by presenting the two rental agreements and an online conversation between Nielsen and Miller to utility company employees. The untainted evidence also demonstrates that Nielsen told the same story and gave Officer Prentice the 2008 rental agreement and the online conversation. This untainted evidence, along with Miller's testimony that he had not seen nor signed the two rental agreements or the online conversation, overwhelmingly establishes that Nielsen presented the forged the 2012 rental agreement to Eruhow-Hagen in order to get the utility company to provide water to the house. Therefore, there was overwhelming evidence to support that the 2012 rental agreement was a forgery and that Nielsen knew the document was a forgery. The majority does not appear to dispute this.

And, Nielsen did not argue that she did not forge the 2012 rental agreement or that she did not know the document was forged. The ultimate fact at issue was whether she acted with the intent to injure or defraud. Here, the State presented untainted evidence establishing that Nielsen was not permitted to live in Miller's house and that she forged several documents, including the 2012 rental agreement, in order to have the water turned on so she could continue living there. And, the State presented untainted evidence through Eruhow-Hagen's testimony that Miller was liable for the water bill if Nielsen failed to pay. Nielsen's conduct in presenting forged documents to continue living in Miller's house without his permission and imposing a financial obligation on

16

Miller without his consent is injurious to Miller. Thus, the overwhelming untainted evidence showed that Nielsen intended to injure Miller by using the forged 2012 rental agreement to get the water turned on in Miller's house so she could continue to live there without permission.

In my opinion, the State presented overwhelming untainted evidence that necessarily leads to a finding of guilt on the forgery charge. Therefore, I respectfully disagree with the majority's conclusion that, if Nielson's statements to Watson were improperly admitted, the error was not harmless.

Accordingly, I concur with the majority's determination that the trial court's CrR 3.5 order was erroneous in so far as the trial court's order did not comply with the requirements of CrR 3.5(c). However, I dissent from the majority's determination that, if Nielsen's statements were improperly admitted, the error was not harmless. I would hold that any error was harmless, and I would affirm Nielsen's convictions.

_____
Lee, J.

17