FILED
COURT OF APPEALS
DIVISION II

2014 SEP 30  AM 9: 07

STATE OF WASHINGTON

BY_____
            DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 44513-1-II |
| Respondent, | |
| v. | |
| DAVID ROBERT TIMMINS, | UNPUBLISHED OPINION |
| Appellant. | |

WORSWICK, P.J. — A jury returned verdicts finding David Robert Timmins guilty of first degree robbery, first degree burglary, second degree theft, and first degree identity theft. Timmins appeals his convictions and sentence, asserting that (1) the trial court improperly instructed the jury on uncharged alternative means of committing first degree robbery, first degree burglary, and second degree theft, (2) the prosecutor committed misconduct that violated his right to a fair trial, (3) the trial court violated his right to present a defense by prohibiting counsel from arguing an inference that missing evidence in the State's control would have been unfavorable to the State's case, and (4) the trial court erred at sentencing by failing to treat some of his crimes as the same criminal conduct when determining his offender score. The State concedes that the trial court erred by instructing the jury on uncharged alternative means. We accept the State's concession and reverse Timmins's first degree robbery, first degree burglary, and second degree theft convictions. We affirm Timmins's first degree identity theft conviction.

FACTS

On September 4, 2012, Timmins, who was an acquaintance of Karen Kimberling, went to Kimberling's home in Vancouver, Washington. Kimberling invited Timmins into her home and the two sat down and talked.

According to Kimberling, Timmins asked her where she kept her credit cards and then looked through her home for her purse. Kimberling stated that after Timmins found her debit card, he demanded that she tell him her personal identification number (PIN). Kimberling said that after she asked Timmins to leave, he punched her left eye and demanded that she tell him her PIN. Kimberling also said that Timmins kicked her hip after she fell to the floor. After Kimberling told Timmins her PIN, he left her home and began making several purchases and cash withdrawals from her account totaling approximately $1,900.

According to Timmins, he and Kimberling drank alcohol and used methamphetamines while at Kimberling's home. Timmins stated that after they ran out of alcohol and methamphetamines, Kimberling gave him her debit card and PIN, asking him to withdraw $120 to purchase cigarettes, alcohol, and methamphetamines. Timmins admitted that he had planned to take out additional money for himself. He further admitted that he kept using Kimberling's debit card beyond the scope of her permission, stating, "I knew I had spent more money than I could replace and I—I wasn't planning on going back, so I—I just ended up deciding to use the card as many times as I could while I could." Report of Proceedings (RP) at 308. Timmins denied that he had hit Kimberling.

2

No. 44513-1-II

Vancouver Police Detective Spencer Harris interviewed Kimberling at the hospital. Kimberling repeatedly told Harris that she received her injuries from a fall, but Kimberling later went to the police station and reported that Timmins had assaulted her.

On January 17, 2013, the State charged Timmins by amended information with first degree robbery, first degree burglary, second degree theft, and first degree identity theft. The State's charging document alleged that Timmins: (1) committed first degree robbery "in the commission of [a theft] or in immediate flight therefrom . . . inflict[ing] bodily injury upon . . . Kimberling;" (2) committed first degree burglary "in entering or while in the building or in immediate flight therefrom . . . intentionally assault[ing] any person therein;" and (3) committed second degree theft by "wrongfully obtain[ing] or exert[ing] unauthorized control over an access device . . . with intent to deprive . . . Kimberling of such access device." Clerk's Papers (CP) at 1-2.

Before trial, the State moved in limine to admit evidence that Timmins had been released from jail on the morning of the incident, which motion the trial court declined to rule on at that time. During the trial, the State renewed its motion to admit evidence of Timmins's release from jail, asserting that the evidence showed that Timmins was near Kimberling's home on the date of the incident. The trial court ruled that the State could not present evidence that Timmins had been released from jail, but it allowed the State to present sanitized evidence that Timmins was in the area on that date. The following exchange took place during the State's examination of Harris:

> [Harris]: [Timmins said] he went to the house after leaving a—a location in Clark County, where he had a few shots of vodka with her and ate some food. And then when I asked him what he did after that he said he went—he went to go visit some friends.

3

> [State]: Okay. So, I just—if I direct your attention to the top [of the police report] did he initially say he just went out of jail and went to visit friends?

RP at 325. Timmins objected and moved for a mistrial. The trial court denied Timmins's mistrial motion but instructed the jury that the State had meant to say that Timmins had been at court on the morning of the incident. Kimberling and Timmins each testified to their version of the facts as stated above.

The State questioned one of the nurses who treated Kimberling about Kimberling's blood test results, but when Timmins objected on the basis of hearsay, the State withdrew its question. After Timmins testified on direct examination that he and Kimberling had used methamphetamines in her home, the State asked Timmins the following during cross-examination:

> [State]: Do you know that they took lab tests?
> [Timmins]: I did not.
> [State]: Has that been discussed previously in your presence?
> [Timmins]: I've heard it talked about.
> [State]: Okay. So you know that she took lab tests while she was at the hospital, correct?
> [Timmins]: Sure, yes.
> [State]: Okay. How do you explain that them [sic]—there was no methamphetamine in her system?

RP at 313.

Defense counsel objected; the trial court sustained the objection and struck the State's question as well as Timmins's response.

The State argued the following during closing:

> He drained her account as quickly and as fast as possible until there was nothing in it and he was able to get no more money from it. This was the person who—whose credibility is at issue. He hadn't intended to take her money. He just happened to clean out her entire bank account. You saw what she—who—you saw this woman. This is the account—he—this—you think that she has means for this? The kind of

4

person who is going to go drain the account of a woman who's obviously very limited in her income, he took every single thing she had.

RP at 439. Defense counsel objected, arguing that the State was appealing to "sympathy not to logic of facts." RP at 439. The trial court did not rule on the objection, but stated only, "Let's move on," and the State continued:

> He took everything. But his—he's saying to you today that that's not the kind of person that he is. That's really what happened when he testified in front of you today. I'm not that type of person, I am a good person, I only just took her money. I wouldn't have done this, I'm not the kind of person who would punch an old lady in the eye and stay at her house and take her debit card. That's exactly what every one of his actions has shown you. He didn't just go take something, he didn't just go buy a dirt bike that he doesn't even need from Wal-Mart, he took everything she had. That's the kind of person he is.

RP at 439-40.

During its closing, defense counsel argued that the State's failure to produce Kimberling's blood test results suggested that the blood results were unfavorable to the State's case. The State objected, but the trial court did not rule on the objection, and instead instructed defense counsel to "move on to a different topic." RP at 429.

The trial court's to-convict jury instruction for first degree robbery included means of committing first degree robbery not mentioned in the information. The instruction listed as an essential element each of the following alternative means of committing the offense:

> (a) That in the commission of these acts or in immediate flight therefrom the *defendant was armed with a deadly weapon* or
>   (b) That in the commission of these acts or in the immediate flight therefrom the *defendant displayed what appeared to be a firearm or other deadly weapon*; or
>   (c) That in the commission of these acts or in the immediate flight therefrom the defendant inflicted bodily injury.

CP at 38 (emphasis added).

The trial court's to-convict jury instruction for first degree burglary also included means of committing first degree burglary not mentioned in the information. The instruction listed as an essential element each of the following alternative means of committing the offense:

> That in so entering or while in the building or in immediate flight from the building the defendant or an accomplice in the crime charged [(1)] *was armed with a deadly weapon* or [(2)] assaulted a person.

CP at 44 (emphasis added).

The trial court's to-convict jury instruction for second degree theft also included means of committing second degree theft not mentioned in the information. The instruction listed as an essential element each of the following alternative means of committing the offense:

> [T]he defendant
> (a) wrongfully obtained or exerted unauthorized control over property of another;
> (b) *by color or aid of deception*, obtained control over property of another; or
> (c) *appropriated lost or misdelivered* property of another.

CP at 47 (emphasis added).

The jury returned verdicts finding Timmins guilty of first degree robbery, first degree burglary, second degree theft, and first degree identity theft. Timmins timely appeals his convictions and resulting sentence.

## ANALYSIS

### I. JURY INSTRUCTIONS

Timmins first contends that the trial court erred by instructing the jury on uncharged alternative means of committing first degree robbery, first degree burglary, and second degree theft. The State concedes reversible error. We accept the State's concession and reverse Timmins's convictions of first degree robbery, first degree burglary, and second degree theft.

It is fundamental that the State inform an accused of the criminal charges to be met at trial, and the State cannot try an accused for an uncharged crime. *State v. Irizarry*, 111 Wn.2d 591, 592, 763 P.2d 432 (1988). Alternative means statutes provide multiple ways in which a person may commit a single crime. *State v. Arndt*, 87 Wn.2d 374, 376-77, 553 P.2d 1328 (1976). When the State charges an accused of committing one of several alternative means to a single crime, a trial court errs by instructing the jury that it may consider the uncharged means by which the accused could have committed the crime. *State v. Bray*, 52 Wn. App. 30, 34, 756 P.2d 1332 (1988). Instructing a jury on an uncharged alternative means violates the defendant's right to be informed of the charges against him or her. *State v. Laramie*, 141 Wn. App. 332, 343, 169 P.3d 859 (2007) (citing U.S. CONST. amend. VI; WASH, CONST., art. 1, § 22).

"An erroneous instruction given on behalf of the party in whose favor the verdict was returned is presumed prejudicial unless it affirmatively appears that the error was harmless." *Bray*, 52 Wn. App. at 34-35. Because a jury instruction that contains uncharged alternative means is presumed prejudicial, "[o]n direct appeal, it is the State's burden to prove that the error was harmless." *In re Pers. Restraint of Brockie*, 178 Wn.2d 532, 536, 309 P.3d 498 (2013) (citing *Bray*, 52 Wn. App. at 34-35).

Here, the trial court's first degree robbery, first degree burglary, and second degree theft jury instructions each contained alternative means of committing those offenses that the State did not allege in its charges against Timmins. Accordingly, those jury instructions were erroneous, and we presume that the error prejudiced Timmins. Because the State concedes reversible error, it does not meet its burden to show that the instructional errors were harmless. Accordingly, we

reverse Timmins's convictions of first degree robbery, first degree burglary, and second degree theft.

## II. PROSECUTORIAL MISCONDUCT

Next, Timmins contends that the prosecutor committed misconduct depriving him of his right to a fair trial. Specifically, Timmins asserts that the prosecutor committed misconduct by (1) mentioning his release from jail in violation of the trial court's ruling in limine, (2) attempting to impeach him with evidence of lab tests that were not presented as evidence at trial, and (3) arguing at closing that the jury should convict based on sympathy to the victim. Because we reverse Timmins's first degree robbery, first degree burglary, and second degree theft convictions based on the trial court's instructional errors, we address his prosecutorial misconduct claim only in relation to his remaining first degree identity theft conviction.

To prevail on his prosecutorial misconduct claim, Timmins must establish "that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and the circumstances at trial." *State v. Thorgerson*, 172 Wn.2d 438, 442, 258 P.3d 43 (2011) (internal quotation marks omitted). To show prejudice, Timmins must prove that there is a substantial likelihood that prosecutorial misconduct affected the jury verdict. *Thorgerson*, 172 Wn.2d at 442-43.

Assuming without deciding that Timmins has shown that the prosecutor's conduct was improper, he cannot demonstrate any resulting prejudice with regard to his first degree identity

8

theft conviction.[1] Timmins admitted in his trial testimony that he had used Kimberling's debit card beyond the scope of her permission to obtain money and goods, which exceeded $1,500 in total value. *See* RCW 9.35.020. And defense counsel similarly conceded during closing argument that Timmins committed first degree identity theft, stating, "Mr. Timmins admitted he took the card, admitted he developed the intent outside the house to—to use it when he was at the Arco and saw how much money was there, and so he says that he used the card, that's not in dispute." RP at 411. In light of Timmins's admissions at trial, he cannot demonstrate that any improper conduct on the part of the prosecutor affected the jury's verdict finding him guilty of first degree identity theft.

## III. RIGHT TO PRESENT A DEFENSE

Next, Timmins contends that the trial court violated his right to present a defense when it limited defense counsel's argument at closing that the State's failure to produce Kimberling's lab results allowed the jury to infer that the lab results were unfavorable to the State.[2] We disagree.

A criminal defendant has a constitutional right to present a defense. *State v. Rehak*, 67 Wn. App. 157, 162, 834 P.2d 651 (1992). "The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973). A trial court has broad discretion to limit the scope of closing argument. *State v. Frost*, 160 Wn.2d 765,

---

[1] In holding that the prosecutor's conduct did not prejudice Timmins with regard to his first degree identity theft conviction, we do not mean to imply that the prosecutor's conduct would not have been prejudicial with regard to Timmins's other counts.

[2] Again, we address this claim only in relation to Timmins's remaining first degree identity theft conviction.

771-72, 161 P.3d 361 (2007). However, a trial court's "[i]mproper limitation of closing argument may . . . infringe upon a defendant's" constitutional rights. *Frost*, 160 Wn.2d at 773.

A trial court's error in limiting the scope of defense counsel's closing argument is subject to harmless error analysis. *Frost*, 160 Wn.2d at 779-82. A constitutional error is harmless beyond a reasonable doubt if "any reasonable jury would have reached the same result in the absence of the error." *State v. Guloy*, 104 Wn.2d 412, 425, 705 P.2d 1182 (1985).

Here, even assuming without deciding that the trial court erred by limiting defense counsel's closing argument, such error was harmless beyond a reasonable doubt as to Timmins's first degree identity theft conviction.[3] As discussed above, Timmins admitted at trial to the elements forming the basis of his first degree identity theft conviction. Thus, any reasonable jury would have found Timmins guilty of that offense even if the trial court had allowed counsel to argue that the jury could infer an unfavorable lab result due to the State's failure to produce the lab results at trial. Accordingly, we affirm Timmins's first degree identity theft conviction.

## IV. SENTENCING

Finally, Timmins contends that the trial court erred at sentencing by failing to treat some of his convictions as the same criminal conduct when computing his offender score. Because we reverse three of Timmins's four convictions, this claim is moot and we do not address it further. *State v. Harris*, 148 Wn. App. 22, 26, 197 P.3d 1206 (2008). We reverse Timmins's first degree

---

[3] Because we address Timmins's right-to-present-a-defense claim only in relation to his first degree identity theft conviction, our analysis should not be read to suggest that any error in the trial court's limitation of defense counsel's argument would have been harmless beyond a reasonable doubt with regard to Timmins's remaining counts.

No. 44513-1-II

robbery, first degree burglary, and second degree theft convictions based on the State's concession and affirm Timmins's first degree identity theft conviction.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Worswick, P.J.

We concur:

_____
Maxa, J.

_____
Lee, J.

11