## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 31529-1-III |
| Respondent, | ) | (consolidated with |
| | ) | No. 31563-1-III) |
| v. | ) | |
| | ) | |
| FRANK EUGENE BRUGNONE | ) | |
| and MICHAEL ORREN GORSKI, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellants. | ) | |

KORSMO, J. — Frank Brugnone and Michael Gorski appeal from their convictions for second degree murder, raising separate challenges arising from their joint trial. Determining that there was no error, we affirm.

### FACTS

This joint prosecution involved a "cold case," the investigation into the 1997 murder of Carolyn Clift, who was killed in her apartment late in the evening of August 28th that year. Two men were seen leaving Ms. Clift's apartment, but police were unable to identify them at the time. Early DNA testing was inconclusive, but more sensitive testing later tied Mr. Gorski to the crime scene.

He had been a subject of the original police investigation because he was seen conversing with Ms. Clift outside a Selah liquor store on August 28th after both had

made purchases at the establishment. The two left together in his car. Later that evening Ms. Clift was seen renting a video at a video store. Brugnone, Clift, and Gorski all were seen later that evening at the Wagon Wheel, but Ms. Clift was not seen in the company of the two men at the establishment.

Around 11:00 p.m., a neighbor in the Selah Square Apartments heard screaming from Ms. Clift's apartment and called another neighbor. When they received no response to their knocks at her door, the two women called 911. While they were awaiting police, some neighbors saw a white male run from Ms. Clift's apartment and one of them heard him call out "get it started." An engine started up and two men drove off in a blue pickup truck.

Police discovered Ms. Clift dead on the floor of her living room. She had been stabbed four times. The final wound penetrated her vertebra and had probably been driven in by a hammer or similar object. The investigation identified several people of interest, but was unable to place any of them at the crime scene that evening. Mr. Gorski told police he had given Ms. Clift a ride home from the liquor store, but otherwise had not known her. He lived at that time at Mr. Brugnone's home. Brugnone's wife told police that her husband drove a blue pickup truck.

In 2007, a witness, Cecil Toney, came forward and told police he had seen Clift and Brugnone, whom he knew, in a blue pickup truck outside the Selah Square Apartments the night of the murder. Later that year, Selah police submitted cigarette

2

butts found at the crime scene for DNA testing. Mr. Gorski's DNA was found on them, as well as on a pair of eyeglasses. Y-STR testing in 2011 on mixed DNA recovered from the victim's fingernails also matched Mr. Gorski and excluded all of the other males under investigation.

Mr. Brugnone, who initially told police he had never been at Ms. Clift's apartment, later confessed that he had been in the apartment at the time of the killing, but denied involvement in the act. He described Gorski attacking Ms. Clift from behind and throwing her into him, leading Brugnone to leave the apartment. As she fell to her knees, Mr. Brugnone told her that "Mike will take care of you."

Charges of second degree murder while armed with a deadly weapon were filed against the two men and proceeded to a joint trial. Brugnone waived his right to a jury trial and his case tried to the bench while a jury heard the case against Mr. Gorski. Brugnone's statements to the police were not presented to the jury.

Both men were found guilty as charged. The trial court imposed identical high-end 244 month sentences in each case. Both men appealed to this court. The two appeals were consolidated and considered by a panel without oral argument.

## ANALYSIS

Mr. Brugnone's appeal challenges the sufficiency of the evidence to support four of the bench trial findings and to support the conviction. Mr. Gorski challenges the admission of Mr. Toney's testimony, the sufficiency of the evidence to support the jury

3

verdict, and the imposition of legal financial obligations (LFOs) against him. We address

those contentions in the order indicated, beginning with Mr. Brugnone's issue.[1] We then

will consider motions filed by both men to waive costs on appeal.

*Sufficiency of Evidence Against Mr. Brugnone*

Mr. Brugnone challenges the sufficiency of the evidence, including four findings

entered after the bench trial. He contends he was merely a bystander. Well settled

standards govern our review of this argument.

"Following a bench trial, appellate review is limited to determining whether

substantial evidence supports the findings of fact and, if so, whether the findings support

the conclusions of law." *State v. Homan*, 181 Wn.2d 102, 105-106, 330 P.3d 182 (2014)

(*citing State v. Stevenson*, 128 Wn. App. 179, 193, 114 P.3d 699 (2005)). "'Substantial

evidence' is evidence sufficient to persuade a fair-minded person of the truth of the

asserted premise." *Id.* In reviewing insufficiency claims, the appellant necessarily

admits the truth of the State's evidence and all reasonable inferences drawn therefrom.

---

[1] Both men also submitted personal statements of additional grounds. RAP 10.10. Each claims the other was guilty and he was found guilty only due to the association with the other, but neither explains why a severance was required. Mr. Gorski also argues his confrontation right was violated, citing to *Bruton v. United States*, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968). However, Mr. Brugnone's statement was never put before the jury, so this claim is without merit. The other arguments are either unintelligible or dependent upon evidence outside the record of this case, so we are unable to address them.

4

*State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Finally, this court must defer to the finder of fact in resolving conflicting evidence and credibility determinations. *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

Mr. Brugnone first challenges five of the findings from the bench trial, which we group into three contentions. The first challenge is to finding 70, which determined that Carolee Appleton had overheard the driver (Brugnone) ask Mr. Gorski, "did you do it?" In her statement to the police, she had quoted Brugnone as stated in finding 70. At trial, defense counsel asked Ms. Appleton if she had told the officer she heard the man say, "did you do it?" Report of Proceedings (RP) at 1012. She stated that the officer got that part right, but she was not sure of the order of the statement with respect to the other statements. She recited it thus: "He was yelling at the other guy, get that started. We've got to get out of here. He said, 'What did you do?' Something like that, in that order." RP 1013. While the latter formulation does vary, the trial court was free under the evidence to credit her original statement ("did you do it?") that she had just affirmed for defense counsel. At most, there was a conflict in the evidence. The trial judge was permitted to accept the first statement in the place of the second.

The next challenge is to finding 75, which states that "Megan Nunley testified that she has some memory of Defendant Frank Brugnone asking her for an alibi for the date

5

of August 28, 1997." This finding is amply supported by the evidence. Ms. Nunley's direct statement in court was "I vaguely remember him asking for an alibi." RP at 926. Replacing "vaguely" with "some memory" is an accurate recitation of the meaning of the statement. This finding, too, is supported by substantial evidence.

The remaining challenges relate to credibility determinations made in the findings. The court found that Mr. Brugnone's statement to the police was both "self-serving" and inconsistent with the physical evidence, and that Mr. Brugnone was not an innocent bystander.[2] Credibility determinations are for the trier of fact and cannot be changed by this court. *Camarillo*, 115 Wn.2d at 71. These findings summed up the trial court's view of the evidence and were within its purview. There was no error.

The ultimate question is whether the evidence supported the bench verdict. Although the evidence of his direct participation is not as clear as it is for Mr. Gorski, it was sufficient to support the verdict. He was present for the killing, urged Mr. Gorski to hurry up after telling the victim that Gorski would "take care of [her]," started up his truck, and waited for Gorski before driving the two away from the scene. Thereafter he lied to the police and maintained that story for 10 years. Given that the victim showed defensive injuries and was stabbed in front and in back, the judge was permitted to infer

---

[2] *See* Findings of Fact 92-94. CP at 155.

that his participation was more active than he admitted. Brugnone's statement about leaving the scene also was inconsistent with the report from the apartment dwellers.

The evidence supports the bench verdict. The trial judge was not required to accept Mr. Brugnone's version of the events.

*Testimony of Cecil Toney*

Mr. Gorski initially argues it was error for prosecutor to refresh Toney's memory on redirect examination after Toney had changed his testimony on cross-examination concerning the time frame when he had seen the two men at the apartment complex. The claim of error was not preserved and also is without merit.

On direct examination, Mr. Toney testified he had seen Gorski and Brugnone at the apartments between 11 p.m. and midnight. RP at 780. On cross examination, after reviewing a transcript of his 2007 statement, Toney indicated the time was between midnight and 12:30 a.m. RP at 791. He subsequently adjusted his time frame and maintained that time during his testimony. RP at 800. The prosecutor subsequently showed Toney his initial statements, made before the interview, that placed the two men there between 11 p.m. and midnight. No objection was lodged to this effort. Nonetheless, Mr. Toney maintained the 12-12:30 time frame even after being shown the initial report. RP at 843.

No objection was raised to the prosecutor's re-examination. Accordingly, the failure to object waived any objection. *State v. Guloy*, 104 Wn.2d 412, 421, 705 P.2d 1182 (1985); RAP 2.5(a). Moreover, the redirect examination was utterly harmless. Even after seeing his original remarks, Mr. Toney stuck with his answer to defense counsel that the incident occurred between 12:00 and 12:30 a.m. The re-examination did not change the witness's testimony in the least.

There was no error at all. This issue is without merit.

*Sufficiency of the Evidence Against Gorski*

Mr. Gorski likewise challenges the sufficiency of the evidence to support the conviction, arguing that he left the apartment complex near 7:30 p.m. and could not have committed the crime. The jury was free to conclude otherwise.

The standards of review, previously mentioned, require that we consider the evidence in a light most favorable to the State and determine whether there was evidence that permitted the jury to find each element of the offense proven beyond a reasonable doubt. *Salinas*, 119 Wn.2d at 201. As also noted in the earlier discussion, the case against Mr. Gorski was quite strong. Despite his protestation that he was not at the scene, DNA from his glasses and cigarette butts put him there, and he was seen leaving the apartment complex soon after the victim's screams alerted the neighbors. Ms. Clift's body showed several defensive wounds and Mr. Gorski's DNA was recovered from her fingernails. Like Mr. Brugnone, he lied to the police about his presence at the crime scene.

8

While Mr. Gorski's testimony conflicted with the State's theory of the case, the jury accepted the latter instead of the former. The evidence amply supported the determination that Gorski was the last person to see Ms. Clift alive and was undoubtedly the killer. It was sufficient.

*Gorski LFO Contentions*

Mr. Gorski's final contention is a claim that the court erred in imposing LFOs without first determining his ability to pay them.[3] We decline to consider this issue, which was not presented to the trial court.

Mr. Gorski was represented at trial by retained counsel and did not claim indigency until after he was sentenced when he then sought to appeal at public expense. The trial court imposed LFOs consisting of restitution ($3,694.21), the $500 crime victim assessment, the $200 filing fee, a $100 DNA collection fee, and a $250 jury demand fee. It is unclear to us whether the $250 jury demand fee is a mandatory or discretionary cost.[4]

---

[3] The judgment and sentence forms used in this case do not include the standard language indicating that the defendant has the ability to pay the LFOs.

[4] *Compare* RCW 10.01.160(2) (indicating in relevant part that the jury fee "under RCW 10.46.190 may be included in costs the court may require a defendant to pay"), *with* RCW 10.46.190 (stating that "every person convicted . . . shall be liable to all the costs . . . including . . . a jury fee . . . for which judgment shall be rendered and collected"). *See also State v. Diaz-Farias*, 191 Wn. App. 512, 524, 362 P.3d 322 (2015) (concluding demand fee could be imposed per RCW 10.01.160(2)) and *State v. Munoz-Rivera*, 190 Wn. App. 870, 894, 361 P.3d 182 (2015) (defendant considered jury demand fee as mandatory cost).

All of the remaining assessments have previously been determined to constitute

mandatory costs that, therefore, are not subject to a determination of ability to pay before

imposition. *State v. Lundy*, 176 Wn. App. 96, 102-103, 308 P.3d 755 (2013).

In these circumstances, where there is no more than $250 that possibly may be at

issue, and where Mr. Gorski did not claim indigency until after sentencing, we exercise

the discretion granted us under *State v. Blazina*, 182 Wn.2d 827, 830, 344 P.3d 680

(2015), and decline to consider this claim initially on appeal.

*Costs on Appeal*

Lastly, both defendants filed similar motions to enlarge time and to deny costs on

appeal in accordance with a recent general order of this court, effective June 10, 2016.

That order requires the requests to have the panel hearing the appeal exercise its

discretion to deny costs in the event the State substantially prevails, must make the

request in the appellant's opening brief or by motion filed within 60 days of the filing of

the brief of appellant. Both opening briefs in this case were filed in 2015, well before the

effective date of the general order.

We grant the motion to extend time and will consider the requests on the merits.

Both men note they are serving lengthy sentences and will be quite elderly upon release

and, therefore, unable to earn a living. Both men were ordered to pay restitution and

will have extensive LFO balances due to the interest attached to the existing

10

judgments. In these circumstances, we exercise our discretion and direct that costs not be awarded to the State in these appeals.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Korsmo, J.

WE CONCUR:

Siddoway, J.

Pennell, J.