2015 DEC 21 AM 11: 53

# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 71468-6-I |
| Respondent | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| MARTIN DALE ADAMS, | ) | UNPUBLISHED OPINION |
| Appellant. | ) | FILED: December 21, 2015 |

SPEARMAN, C.J. — Martin Dale Adams was convicted of assault in the second degree – domestic violence. He appeals his conviction, arguing that the trial court (1) denied him his right to a fair trial because he did not receive the required number of peremptory challenges; (2) improperly admitted evidence of his controlling behavior and drug use; (3) allowed the State to introduce prior consistent statements of witnesses in violation of ER 801; and (4) violated his right to remain silent by allowing the State to elicit testimony about his demeanor. Finding no error, we affirm.

## FACTS

Martin and Kim Adams were married and lived together in a motor home. On September 19, 2013, Kim awoke to Adams yelling at her. He then hit her in

the face and she fell into the couch. At some point, Adams punched her in the ribs so hard that she lost bladder control.

Kim's coworker Richard Loewen gave her a ride that day to the casino where they worked. Loewen saw that she appeared to be in a lot of pain and was holding her ribs. Kim told him that Adams punched her in the ribs. Another of their coworkers noticed that Kim looked terrible, could barely breathe and was having a hard time walking. Kim had a friend take her to the hospital. She had injuries to both cheeks, nose and chest, including two acute rib fractures. The emergency room nurse put Kim in contact with the police.

Adams was initially charged with one count of assault in the third degree–domestic violence and one count of felony harassment–domestic violence. Before trial commenced, the assault charge was amended to second degree and the felony harassment charge was dismissed. In addition, Adams moved to exclude evidence of allegations of prior bad acts, specifically uncharged acts of domestic violence.

Before voir dire began, the court asked counsel if they preferred to select one or two alternate jurors, and neither party indicated a preference. The court decided to select two alternates and explained that each party had "six preemptory [sic] challenges" and that the

> custom has been to select 12 jurors and then ask each of you to
> exercise an additional preemptory [sic] as to the 13th and/or 14th if
> you want to do that, without telling the jury what the significance of
> all that is and without telling the jury who the alternates are, but

> under that procedure we then dismiss jurors 13 and 14 before the jury goes to deliberate if we don't need their attendance.
>     An alternative I understand some courts select all 13 or 14 jurors then drop (sic) names by lot to determine who the alternates are. If counsel agree you'd like to do that we can do it that way, otherwise we'll simply go with the way I describe where with [sic] pick 13 people, 12 people and 13th and 14th."

Verbatim Report of Proceedings (VRP) (12/10/13) at 55-56. The parties agreed and selection proceeded accordingly.

The State then chose to excuse five jurors and waive one challenge. Adams used all six peremptory challenges. The trial court indicated that the selection for the alternates would begin with juror 27 and inquired if counsel were of the same opinion. The trial court confirmed that it would be selecting two alternates and that each party had one challenge to exercise against possible alternate jurors.

Selection of alternates began with jurors 27 and 29 being considered as potential alternates. The State exercised a peremptory challenge as to juror 29, which resulted in juror 31 being selected as a potential alternate. At that time, Adams sought to challenge juror 19, who had already been seated. The State objected and the trial court denied Adams' request. When defense counsel asked for clarification, the court informed her that the parties could not go back into the panel, but could only exercise their additional peremptory challenges forward on the jurors selected as alternates. Adams then "accepted the panel" and did not

3

challenge either juror 27 or 29, the two alternate candidates. Juror 19 was seated; neither alternate juror deliberated.

At trial, Officer Kathryn Dearborn testified that after meeting Kim at the hospital, she located Adams and told him that his wife was in the emergency room. When the State asked her about his demeanor when he received this news, she testified "[h]is demeanor was not one I would expect from a spouse that had just learned their wife or significant other was in the emergency room." VRP (12/12/13) at 268. When asked to explain, the officer stated, "He was not shocked, he was not surprised." Id. Adams objected at this point, but was overruled. Adams also testified to his initial contact with Officer Dearborn. He stated she told him that his wife was in the hospital with internal bleeding and that he was being arrested for assault. In response, he testified that he "asked them if I could see my wife and they said no." Id. at 352. He also testified that he asked three times if he could see her, and was told "absolutely not." Id.

Kim testified that Adams was controlling and that he would spend her paycheck gambling. She testified "if I try to call somebody a friend of mine or something he wouldn't let me or he wouldn't let me answer the phone if somebody called." VRP (12/11/13) at 86. She also testified that she "work[ed] five days a week and when I get my check he wants to control it. And I can't save any money because he wants to go gamble with it. And we get some gas and cigarettes and then the rest of it goes to the casino." Id. at 87. Adams objected to

4

this testimony on the basis of relevance. On cross examination, Adams questioned Kim about whether she had provided statements in the past indicating that he had been convicted of assaulting her. She was also asked about what she remembered telling the detectives about Adams' drug use. On redirect, the State elicited testimony from Kim that she told the police that he had used drugs in the past. Kim was also asked on redirect specifically whether she had fabricated this assault in order to help her get a divorce, and she said she did not. Id. at 115.

Adams was found guilty of assault in the second degree–domestic violence and sentenced to a standard range sentence of 26 months.

He appeals.

DISCUSSION

Peremptory Challenges

Adams first argues that he was denied his right to exercise peremptory challenges in violation of his right to a fair trial by an impartial jury under the Sixth and Fourteenth amendments of the United States Constitution, and article I, sections 21 and 22 of the Washington State Constitution. He claims that the trial court erred by allowing him only one peremptory challenge for two alternate jurors, in violation of CrR 6.5. The State concedes that the trial court "did err in not granting [Adams] the number of peremptory challenges he was entitled to

under the court rule," but argues that the error was harmless because Adams failed to object and the alternate jurors did not deliberate. Br. of Respondent at 7.

RCW 4.44.210 sets forth the procedure for peremptory challenges.[1] According to the statute, each party may challenge jurors alternately until the number of challenges have been exhausted. RCW 4.44.210. The statute specifies that if a party declines to exercise a peremptory challenge during the alternative selection process, then that party may not challenge any of the current jurors under consideration and may only challenge jurors subsequently added to the pool. Id. Under CrR 6.4(e)(1), each are allotted six peremptory challenges in cases punishable by imprisonment for more than a year. After jurors have been passed for cause, the parties may alternately exercise peremptory challenges until they are exhausted or the jury is accepted. CrR 6.4(e)(2). Acceptance of a jury does not waive any remaining peremptory challenges to jurors that are called later. Id. Each party is entitled to one peremptory challenge for each alternate juror to be selected. CrR 6.5.

---

[1] RCW 4.44.210 reads:

> The jurors having been examined as to their qualifications, first by the plaintiff and then by the defendant, and passed for cause, the peremptory challenges shall be conducted as follows, to wit:
> The plaintiff may challenge one, and then the defendant may challenge one, and so alternately until the peremptory challenges shall be exhausted. During this alternating process, if one of the parties declines to exercise a peremptory challenge, then that party may no longer peremptorily challenge any of the jurors in the group for which challenges are then being considered and may only peremptorily challenge any jurors later added to that group. A refusal to challenge by either party in the said order of alternation shall not prevent the adverse party from using the full number of challenges.

6

The parties agree that the trial court erred by allowing only one peremptory challenge for two alternates. The only question is whether the error requires reversal. Adams correctly cites the rule that any impairment of a party's right to exercise a peremptory challenge constitutes reversible error without a showing of prejudice. State v. Vreen, 143 Wn.2d 923, 931, 26 P.3d 236 (2001), State v. Evans, 100 Wn. App. 757, 774, 998 P.2d 373 (2000). Relying on these cases, he first argues that he is entitled to a new trial because his right to exercise a peremptory challenge was impaired when the trial court refused to allow him to challenge juror 19. The argument is without merit. It is undisputed that at the time Adams attempted to exercise that challenge, he had already exercised six peremptory challenges. He does not contend, nor could he, that he is entitled to more than that. And, although he may have misunderstood the trial court's instructions that any additional challenges beyond six were reserved for potential alternate jurors, he cites no authority for the proposition that he was entitled to exercise a seventh challenge against juror 19. Because Adams was not entitled by statute or court rule to exercise a challenge to juror 19, he cannot show that any right was impaired by the trial court's refusal to allow him to do so.

Adams also seems to argue that his right to exercise a peremptory challenge was impaired because he was erroneously allowed only one peremptory challenge to the two alternate jurors. We disagree. Once Adams learned that he could not strike Juror 19, he accepted the panel, including the

alternate jurors. Since Adams failed to exercise even the one challenge he was given, it is evident that the alternate jurors were seated because he was satisfied with them, not because his right to challenge them was impaired.

Moreover, an error regarding alternate jurors is harmless where the alternate jurors did not deliberate. State v. Rivera, 108 Wn. App. 645, 657, 32 P.3d 292 (2001), abrogated on other grounds by, State v. Sublett, 176 Wn.2d 58, 72, 292 P.3d 715 (2012). In Rivera, the trial court gave the parties fewer than the required number of peremptory challenges for alternate jurors. The error was discovered after the jury had been accepted. 108 Wn. App. at 647. The two alternates were excused and neither participated in deliberations. Id. On appeal, we found such error was harmless because it "did not prevent Rivera from having a fair trial before a fair and impartial jury." Id. at 651-52. Likewise, in this case, the error is harmless because neither of the alternates deliberated and Adams has not made any showing that the panel was not impartial.

ER 404(b) Evidence

Adams argues that the trial court erred when it admitted highly prejudicial evidence of uncharged wrongful conduct. According to him, the State was improperly allowed to introduce testimony stating that he was a controlling person who used drugs and gambled away their money. We review a trial court's evidentiary rulings for abuse of discretion. State v. Guloy, 104 Wn.2d 412, 429-30, 705 P.2d 1182 (1985). A court abuses its discretion only when its decision is

manifestly unreasonable or based on untenable grounds. State v. Wade, 138 Wn.2d 460, 464, 979 P.2d 850 (1999).

Adams first argues that the evidence of controlling behavior and gambling should have been excluded under ER 404(b). The State argues that Adams did not object to its admission under ER 404(b) at trial, so he cannot challenge on appeal. Adams argues that he had a standing objection to such evidence because he made an ER 404(b) objection to testimony about "uncharged domestic violence allegations and claims of any past or future fear of [Adams]" in his motion in limine. Reply Br. at 3.

On appeal, a party may not raise an objection not properly preserved at trial absent manifest constitutional error. State v. Powell, 166 Wn.2d 73, 82, 206 P.3d 321 (2009). This rule is strictly construed because "trial counsel's failure to object to the error robs the court of the opportunity to correct the error and avoid a retrial." Id., (citing State v. Kirkman, 159 Wn.2d 918, 935, 155 P.3d 125 (2007)). An appellate court will not reverse the trial court's decision to admit evidence where the trial court rejected the specific ground upon which the defendant objected, and then, on appeal, the defendant argues for reversal based on an evidentiary rule not raised at trial. Id. An evidentiary error, such as erroneous admission of ER 404(b) evidence, is not of constitutional magnitude. Id. at 84 (citing State v. Everybodytalksabout, 145 Wn.2d 456, 468-69, 39 P.3d 294 (2002)).

At trial, the State asked Kim to describe her relationship with Adams and she stated that he was very controlling. Adams objected on the basis of relevance; the trial court overruled the objection because it was preliminary information. Adams also objected to Kim's testimony about her finances and Adams' gambling on the basis of relevance. Adams objected to other witnesses' testimony on the same subjects on the basis of relevance, and later, ER 401 and 403. Adams did not specifically object to any of this testimony under ER 404(b). In addition, Adams' pre-trial motion in limine was limited to "uncharged allegations of domestic violence." Clerk's Papers (CP) at 12. He made no reference to testimony about his attempts to control Kim's finances or her contact with friends. We conclude that Adams failed to preserve for appellate review an objection to Kim's testimony based on ER 404(b).

We would reach the same result even if Adams had properly preserved his objection for appeal because the error, if any, was harmless. An evidentiary error which is not of constitutional magnitude, such as erroneous admission of ER 404(b) evidence, requires reversal only if the error, within reasonable probability, materially affected the outcome. State v. Halstine, 122 Wn.2d 109, 127, 857 P.2d 270 (1993). Here, we are satisfied that Kim's statements about Adams' past behavior did not materially affect the outcome. Kim and other witnesses testified about the details of the incident and the extent of her injuries.

In light of the State's other evidence, any error in admitting the challenged testimony was harmless.

Adams next argues that the State impermissibly elicited testimony about his drug use, and argues that its prejudicial effect outweighed its probative value. The State argues that the testimony was only elicited in response to Adams' attempt on cross-examination to discredit Kim through discrepancies in the information she gave to the police. According to the State, Adams opened the door to the challenged testimony and the trial court properly limited its scope.

A trial court's decision as to the scope of redirect examination and whether to admit evidence is within its wide discretion. State v. Gallagher, 112 Wn. App. 601, 609, 51 P.3d 100 (2002). This court will not reverse absent a manifest abuse of discretion. Id. A party may introduce inadmissible evidence if the opposing party has no objection, or may choose to introduce evidence that would be inadmissible if offered by the opposing party. 5 KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE §103.14 (5th ed. 2015). The introduction of such inadmissible evidence is often said to "open the door" both to cross examination that would be improper and to the introduction of normally inadmissible evidence to explain or contradict the initial evidence. Id.

Adams asked Kim on cross examination whether she "recall[ed] telling Officer Dearborn on the day of the, the day that you were at the ER that Martin had been doing meth the night of the incident." VRP (12/11/13) at 98. He also

11

asked whether she recalled telling Detective Renick that Adams "'was not using drugs' and then giving a particular reason as to why he was not using drugs." Id. On redirect, the State asked Kim whether she told the police about Adams' drug use and what she told them. The State questioned Detective Renick about what Kim had told her about Adams' prior drug use and Adams objected on the basis of relevance. Adams argued that Kim's cross examination questions only pertained to the incident, not Adams' drug use in general. The trial court ruled that evidence regarding Kim's statements about Adams' drug use the night of the incident were relevant, and that questioning could only pertain to what she discussed with the police.

Adams brought up Kim's discussions with the police about drug use, and the trial court limited the scope of additional questioning to those discussions and any drug use on the night of the incident. Fairness dictates that the rules of evidence will allow the opponent to question a witness about a subject matter that the proponent first introduced through the witness. Gallagher, 112 Wn. App. at 610. The trial court did not abuse its discretion in allowing the State to introduce this evidence.

Evidence of Prior Consistent Statements

Adams next argues that the trial court improperly admitted out of court statements, because they were not necessary to rebut a claim of recent fabrication as required by ER 801(d)(1)(ii). The State argues that the statements

are admissible under ER 801(d)(1)(ii) and ER 613, because Adams implied recent fabrication on cross examination. The State also argues that Adams not only failed to object but also opened the door to the prior consistent statements by questioning witnesses about what Kim told them.

ER 801 (d)(1)(ii) provides that a statement is not hearsay if:

The declarant testifies at the trial or hearing and is subject to cross examination concerning the statement and the statement is ... (ii) consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive....

A claim of recent fabrication may be implied or express. State v. Thomas, 150 Wn.2d 821, 866, 83 P.3d 970 (2004). If cross examination gives rise to an inference that the witness changed her story in response to an external pressure, then whether the witness gave the same account prior to the onset of that pressure becomes highly probative of the veracity of the witness's story. Id. at 865 (citing State v. McDaniel, 37 Wn. App. 768, 771, 683 P.2d 231 (1984)). The proponent of the testimony must show that the witness made the statement before the motive to fabricate arose. Id. Additionally, prior consistent statements must have been made under circumstances where the witness was unlikely to have foreseen the legal consequences of the statements. State v. Makela, 66 Wn. App. 164, 168-69, 831 P.2d 1109 (1992).

The record supports the trial court's finding of a claim of recent fabrication. During the motions in limine, the State raised the issue of whether the defense

was going to present evidence of allegations of domestic violence to show fabrication. Adams responded that he had evidence suggesting that Kim made allegations when it was advantageous to her. On cross, Adams attacked Kim's veracity by questioning whether she had reported domestic violence in order to get a criminal charge against her reduced. He also insinuated that Kim made the instant allegation to give her an advantage in the divorce proceedings. On redirect, the State sought to dispel the question of fabrication and specifically asked Kim if she had conjured up the story in order to support her petition for divorce. The trial court did not abuse its discretion when it admitted the testimony under ER 801.

<u>Right to Silence</u>

Adams argues that the State used his "silence" against him in violation of Fifth Amendment and art. I, § 9, because the State used testimony about his demeanor during the arrest as "substantive evidence of his guilt."[2] He challenges the detective's comments about Adams' failure to express surprise and concern for Kim upon learning she was in the hospital. The State argues that no rights were violated because Adams did not invoke his right to remain silent and answered questions. As a result, the State was permitted to comment on what

---

[2] Adams also argues for the first time in his reply brief that the prosecution violated CrR 3.5 by failing to advise him that they intended to use his statements from the time of arrest. Reply Br. at 5. An issue raised for the first time in a reply brief is too late to warrant consideration. <u>Cowiche Canyon Conservancy v. Bosley</u>, 118 Wn.2d 801, 808, 828 P.2d 549 (1992). We therefore decline to consider this argument.

Adams did not say. The State also argues that the right against self-incrimination only applies to testimonial evidence, not observations of conduct.

A defendant's right to silence is derived from the fifth amendment and art. I, § 9. State v. Easter, 130 Wn.2d 228, 239, 922 P.2d 1285 (1996). No person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V; see also Wn. Const. art. I, § 9. "The right against self-incrimination is liberally construed.... It is intended to prohibit the inquisitorial method of investigation in which the accused is forced to disclose the contents of his mind, or speak his guilt. State v. Holmes, 122 Wn. App. 438, 443, 93 P.3d 212 (2004) (quoting Easter, 130 Wn.2d at 236). A police witness "may not comment on the silence of the defendant so as to infer guilt from a refusal to answer questions." State v. Lewis, 130 Wn.2d 700, 705, 927 P.2d 235 (1996).

Adams argues that the testimony about him not showing any surprise or shock was an improper comment on his silence. He relies on Easter, in which the arresting officer referred to Easter as a "smart drunk," and explained that by using that term, he meant that he was "'evasive, wouldn't talk to me, wouldn't look at me, wouldn't get close enough for me to get good observations of his breath and eyes....'" 130 Wn.2d at 233. The officer further testified that the defendant "totally ignored him" when he asked if he had been drinking, and upon additional questions, the defendant looked down, "'once again, ignoring me, ignoring my questions.'" Id. at 232. The state Supreme Court found that Easter's

right to silence was violated by the officer's comments because the testimony implied Easter's guilt by calling the jury's attention to his prearrest silence.

When a defendant does not remain silent and speaks to investigators, however, a police witness may comment on what he does or does not say. State v. Clark, 143 Wn.2d 731, 765, 24 P.3d 1006 (2001). Adams was not silent about the charges against him or the news that his wife was in the hospital. He testified that he asked the officers three different times if he could see his wife and that he "was very concerned," when he heard that Kim was in the hospital. VRP (12/12/13) at 372. The record also contains evidence of Adams' statements denying the charges. On cross examination and over the State's objection, the detective explicitly testified that Adams "denied that he hit her," and that her report read that "Adams denied everything. He stated he had not hit Kim Adams and had not threatened to kill her." VRP (12/12/13) at 273-74. Because Adams did not remain silent and spoke with the police both about his wife's hospitalization and the charges against him, we find that the testimony about his perceived lack of surprise or shock did not violate his Fifth Amendment rights.[3]

---

[3] The State also argues that the officer's testimony was not a comment on Adams' silence but a description of his demeanor. State v. Barry, 183 Wn.2d 297, 308, 352 P.3d 161 (2015). ("demeanor" was "not equivalent to 'silence'" and that a bare reference to demeanor, without more, is "not tantamount to impermissible commentary on a defendant's failure to testify."). Because we find that the testimony did not violate Adams' Fifth Amendment rights and was harmless, it is not necessary for us to determine whether the evidence of Adams' demeanor contained a testimonial component.

This case is distinguishable from our decision in Holmes, 122 Wn. App. at 442, in which we found constitutional error based on a comment about the defendant's lack of surprise after being informed of the charges against him. In Holmes, the detective testified that the defendant "didn't appear surprised" when he was "advised what the charge was," and did not display "any kind of denial or something that [the detective] would normally expect to see." Id. The issue was "whether the testimony directed the jury's attention to protected silence...." Holmes, 122 Wn. App. at 445. The comments about Adams also referenced a lack of surprise, but were not regarding a failure to proclaim innocence. Unlike Holmes, the record shows that Adams explicitly denied the charges at the time of his arrest; there was no protected silence to which the comment would have directed the jury's attention

Even if he had remained silent, and the comment indirectly referred to that silence, Adams cannot show prejudice. In order to show prejudice, a defendant must show that the comments on his silence were used as substantive evidence of his guilt. State v. Burke, 163 Wn.2d 204, 215, 181 P.3d 1 (2008). Here, Officer Dearborn's testimony did not direct the jury's attention to Adam's silence, but rather to his lack of a discernible response to emotional news. Adams objected to the testimony at trial and the inquiry into his demeanor was properly limited in scope. He also presented testimony that he asked if he could see his wife to rebut any inference that he was unconcerned. In closing argument, the State did

refer to Adams' "lack of concern" for Kim, as evidenced by his demeanor and his inquiries about whether he could see her, but directed the jury's attention to Adams' statements, not his silence. There was no error on this issue.

Finally, we reject Adams' argument that the cumulative effect of the errors denied him a fair trial under the fourteenth amendment and art. I, § 3. The only error supported by the record was the trial court's failure to provide Adams with the requisite number of peremptory challenges for alternate jurors, which was harmless. There was no accumulation of errors that denied Adams a fair trial. State v. Greiff, 141 Wn.2d 910, 929, 10 P.3d 390 (2000).

Affirmed.

Spearman, C.J.

WE CONCUR:

Schindler, J.

Becker, J.