# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | No. 74028-8-I |
| | ) | |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| DEJON LEE PAYNE, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: October 9, 2017 |
| | ) | |

MANN, J. — Dejon Payne was charged with attempted murder in the first degree with a firearm and assault in the first degree with a firearm, after shooting Terrance Nicholson six times at close range. Nicholson identified Payne as the shooter both immediately after the shooting and at trial. A jury convicted Payne as charged. The trial court vacated the first degree assault conviction on double jeopardy grounds. Payne appeals arguing that the trial court erred by: (1) excluding evidence that one of the State's witnesses had a pending criminal charge, (2) admitting evidence that Payne was arrested in California five months after the shooting, and (3) denying his motion for a new trial based on juror misconduct.

We affirm.

## FACTS

### Background

Most of the parties and witnesses in this case lived, or spent considerable time, at the Ballinger Homes apartment complex in Shoreline. During the winter of 2013 to 2014, Nicholson was 34 years old. Nicholson was a local multi-sport athlete during high school and attended Shoreline Community College and the University of Central Florida where he graduated with a degree in business finance. Nicholson's best friend since childhood was Romell Liddell. Liddell's long-time girlfriend and mother of his two daughters, Vi Le, was a resident at Ballinger Homes. Although Liddell did not officially live at the complex, he spent most of his time there.

Nicholson and Liddell were also friends with several other people living in the area, including Kevin Nguyen[1] and his brother Hoang Nguyen. Another neighbor, Patric Heisser, lived with his girlfriend across the courtyard from Liddell and Le. He was acquainted with Liddell and Le but did not know them very well. Their daughters played together at the complex.

In the summer of 2013, Dejon Payne, a 29 year old from Los Angeles, started spending time at the Ballinger Homes complex and socializing regularly with Liddell, Nicholson, and their friends. They knew Payne only as "Young." Payne was staying in a nearby unit.

Later in the summer, Payne started displaying large amounts of cash and boasting of plans to buy an expensive sports car. Nicholson, Liddell, and some of their other friends, talked about stealing from Payne. In October 2013, Nicholson came

---

[1] To distinguish from his brother Hoang, Kevin Nguyen will be referred to as "Nguyen."

home to find Liddell and a friend there with about $10,000 of Payne's cash, his cellphone, and some of his electronics. Liddell gave Nicholson some of the money.

On October 8, 2013, Payne contacted the police and reported that four days earlier he woke up in his friend's apartment at Ballinger Homes to see Nicholson and another man leaving with his bag of cash and electronics. Payne was upset about the theft and wanted the police to find his property. Shortly after, Payne confronted Nicholson and accused him of taking the money. Nicholson said that he did not take the money and did not know what happened to it. After the theft, Nicholson testified that he would still see Payne around the Ballinger Homes complex but Payne no longer hung out with Nicholson, Liddell, or their other friends.

### The Shooting

The shooting took place on January 1, 2014. Heisser testified that in the early afternoon, he looked out his window overlooking Le's apartment and saw Payne standing outside the building. Heisser did not know Payne personally, but recognized him because he had seen him around the complex many times. Heisser was unable to identify Payne in a pretrial photomontage as the man standing outside on the day of the shooting. However at trial, Heisser identified Payne as the man he had seen standing outside of Liddell and Le's apartment.

Heisser also testified that he saw Liddell leave his house about 10 minutes before the shooting and saw Liddell with Nguyen a few minutes before the shooting. Nguyen confirmed that before the shooting he and Liddell left the complex to visit a friend down the street. Nguyen also testified that he and Liddell saw Payne near the parking lot and talked to him briefly.

Shortly thereafter, Nicholson arrived at Le's residence to visit Liddell. Nicholson went around to a side door and knocked, but nobody answered. Nicholson soon noticed that Payne was standing behind him. After a brief conversation, Payne shot Nicholson in the stomach. The two wrestled for the gun, and another gunshot hit Nicholson in the thigh. Nicholson fell to the ground and Payne shot him four more times, six shots in total. Payne then ran from the area.

Hoang Nguyen testified that he heard someone say, "what's up man?" and then heard a series of gunshots. Hoang ran to Nicholson and saw a black man in a hooded jacket fleeing around the other side of the building, with no one else around. Hoang called 911 and stayed with Nicholson, who told him that "Young" had shot him.

Le testified that she heard the shots from inside the apartment and heard Nicholson's cry for help. She opened her door and found Nicholson on the ground. When she asked Nicholson who shot him, he said "Young." Liddell showed up a few minutes after the shooting and Nicholson told him "Young" had shot him. When police arrived, Nicholson also told a deputy that "Young" had shot him. The deputies immediately began searching for "Young," who they later identified as Payne.

Payne was eventually arrested in California on May 30, 2014. Payne was charged with attempted murder in the first degree with a firearm and assault in the first degree with a firearm.

### Cross-Examination of Kevin Nguyen

Before calling Kevin Nguyen to testify, the State notified the trial court that it was attempting to arrange time for defense counsel to interview Nguyen "given that he has told Detective Bartlett that he has more helpful information for our case in the context of

he has got pending charges." After interviewing Nguyen, Payne informed the court that Nguyen had a pending residential burglary charge, and that he told Detective Bartlett "that he would give her helpful information if she would give him a deal on the charge." Payne acknowledged that Detective Bartlett and the prosecutor informed Nguyen that a deal "wasn't going to happen." Payne informed the court that he intended to question Nguyen about his offer.

The trial court questioned the relevance: "If he is not getting any kind of offer from the State, I don't see how it is relevant that he has a charge. It is not readily admissible, and I don't see how it goes to bias if he doesn't have the predicate for bias." Payne replied that Nguyen told her "that if they gave him a deal, he would give some helpful information" and that "he would have just made something up." Payne argued that this went to his credibility—that "he will make up facts about this case in any way that's helpful to him." The trial court reiterated that Nguyen offered to give information in exchange for a deal, but "the deal was refused, there was no prospect of a deal, so it is not pertinent here, okay?" The court concluded "It is distracting, it is irrelevant, it is out."

During cross-examination, Payne attempted to impeach Nguyen's credibility by pointing out that he had previously told a defense investigator that he never saw Payne at the scene, and that he had never known anyone named "Young." Payne also asked Nguyen about a statement he allegedly made that "he was not sure which version [he was] going to say on the stand." Nguyen explained these statements by claiming he was scared for himself and his family, or simply denied having made them.

*Evidence of Payne's Arrest in California*

Before trial, Payne moved to exclude "all testimony that Payne was arrested in California and extradited back to face these charges" because it was not related to "fleeing or consciousness of guilt." Payne's trial brief specifically moved to exclude "testimony or argument that he 'fled' to California to avoid prosecution and that flight demonstrates consciousness of guilt."

The State replied that it intended to argue that Payne fled to California after the shooting. The State planned to support this argument with evidence that Payne had been arrested in California four months after the shooting. There was evidence that Angel (Miranda) Olson, Payne's girlfriend and mother of his child, had been in Washington at the time of the shooting, used her debit cards in California a few days after the shooting. The inference being that Payne was probably with Olson at the time. The trial court believed evidence that Payne ran from the scene and "very shortly thereafter" relocated to California "could be" viewed as a deliberate effort to avoid arrest and prosecution, and "could be" is "all that's really needed for this to be admissible."

The trial court ruled the evidence was admissible as evidence of flight on the condition that the State was able to lay the foundation for the evidence by demonstrating a link between Payne and Olson and their shared child. Assuming the foundation was laid, the trial court limited the evidence of flight to: (1) Payne's behavior in running away and into a vehicle that left the scene, (2) where hotel records showed Olson was staying while the police were looking for Payne, (3) Olson's location after the shooting based on business records such as EBT transactions, and (4) where Payne was ultimately located at the time of his arrest.

Near the end of the State's case, Payne pointed out that the nexus between Payne and Olson had not been established. Payne sought to ensure that the testifying police officers were not going to "testify about the hotels." The State conceded that it was not "going to make that nexus," so it would not ask "anything in particular about Miranda Olson." Payne did not reiterate his request that the trial court exclude the evidence that Payne was arrested in California.

Later, the State asked Detective Bartlett, the State's final witness, about the police investigation:

> [Prosecutor]: What was being done to try and find [Payne]?
> [Bartlett]: There was a warrant placed, the case was charged, a warrant was placed out through NCIC, which is nationwide. So again, if anybody runs his name, that warrant would pop up.
> [Prosecutor]: When was Mr. Payne arrested?
> [Bartlett]: I believe it was December 19th, 2014.
> [Prosecutor]: Is that in your report?
> [Bartlett]: No.
> [Prosecutor]: Where was Mr. Payne arrested?
> [Bartlett]: In California.
> [Prosecutor]: All right. Are you certain about the date, or is that just a date that stuck out to you?
> [Bartlett]: Well I can't be certain without having the paperwork.

Report of Proceedings (RP) (May 4, 2015) at 317-18. The State then rested. Payne did not object to this testimony or cross-examine the witness on this issue.

### Verdict

After deliberation, the jury convicted Payne of attempted murder in the first degree with a firearm and assault in the first degree with a firearm. The trial court vacated the first degree assault conviction on double jeopardy grounds.

-7-

*Motion for New Trial Based on Allegations of Jury Misconduct*

During voir dire, the names of potential witnesses were read to the prospective jurors and the jurors were asked if they recognized any of the witnesses. Jurors 12 and 13 did not respond. The trial court also advised, "[u]sually if you know somebody well enough to recognize them, you normally know their name too. But I will tell you that if you spot someone that you know when they come in to testify, just let us know right away."

Nicholson began his testimony on April 29. Nicholson testified that he went to three different local high schools and played "all sports," including "basketball, football, soccer, ran track." He testified that he continued playing basketball at Shoreline Community College and the University of Central Florida. Nicholson also testified that one of the reasons Liddell became his best friend was that Liddell's older brother taught Nicholson to play basketball. Basketball was one of Liddell and Nicholson's primary activities at Ballinger Homes.

The day after Nicholson's testimony, the trial court informed the parties that juror 13:

> recognized Mr. Nicholson's high school, it's a high school she attended.
> She didn't recognize Mr. Nicholson, didn't know Mr. Nicholson. Her worry
> is if people who attended her high school show up, that she might
> recognize them.

The court then stated that it did not feel "concerned about this" and was not inclined to question the juror unless the parties wanted her to. The trial court directed juror 13 to inform the court if she recognized anyone else. Neither the State nor Payne objected or asked the court to further question juror 13.

After the verdict, Payne moved for a new trial based on juror misconduct.[2]  Payne argued his right to a fair trial was violated because one of the jurors failed to disclose that he was personally acquainted with witness Patric Heisser and that he injected this information into the deliberations.  Payne also argued that this new information, combined with juror 13's recognition of Nicholson, was sufficient to prejudice Nicholson.  Payne supported his motion with a declaration from a defense investigator recounting a conversation with juror 4.  According to the investigators declaration, Juror 4 stated, "[o]ne of the jurors recognized the witness, 'Patric' [Heisser] as someone with whom he had played basketball" and "[t]he second juror knew 'Terrence' [Nicholson] from high school" and "remembered 'Terrence' [Nicholson] as a star basketball player."

The trial court called juror 4 to testify.  Before her testimony, the trial court indicated that with respect to the allegations about juror 13 knowing Nicholson,

> this is not news for any of us, because during the trial juror number 13 . . . disclosed that she knew Mr. Nicholson from high school. And my memory is that we specifically asked her about that outside the presence of the other jurors.  She indicated it wouldn't affect her, and we agreed to keep her.  So I'm not planning on inquiring more into that issue.   It was explored during trial.

Payne did not object.

The trial court then proceeded to question juror 4.  Juror 4 told the court that at the end of deliberation, while the jurors were discussing "whether or not we felt [the witnesses] were trustworthy in what they were saying," two jurors mentioned recognizing witnesses.  According to juror 4, juror 13 said she knew of Nicholson from

---

[2] According to the investigators declaration, Juror 4 stated, "[o]ne of the jurors recognized the witness, "Patric" as someone with whom he had played basketball" and "[t]he second juror knew 'Terrence' [Nicholson] from high school" and "remembered 'Terrence' [Nicholson] as a star basketball player."

high school as a "super athlete" as being "this star, up and rising athlete person" and that Juror 13 said she was "surprised that this would happen to him." Juror 4 then said another juror "thought he remembered seeing Patric [Heisser] at a basketball game, and I can't remember if he said Patric [Heisser] was a coach or was somehow involved, but that that's where he thought he recognized him from." She claimed the juror said Heisser might have been a basketball coach, and if he was a coach, then he "has to be somewhat of a trustworthy person, like why would they lie." Juror 4 acknowledged that the other juror did not say he was sure whether Heisser was a coach. In addition, juror 4 did not recall the juror having mentioned interacting with Heisser at the time. She confirmed that both jurors stated that they did not think this recognition was playing into their judgment of the verdict.

After determining juror 12 was the juror that recognized Heisser, juror 12 was called to testify. Juror 12 informed the court that he might have recognized one witness, explaining, "I don't know him. We all grew up in the Central District, so he was younger than me and I don't know him personally." He explained that he did not know Heisser as a basketball coach, but only that he may have seen him when he was younger and playing basketball and that was the only time he remembered seeing him. Juror 12 said that he mentioned recognizing Heisser while the jurors were discussing the witnesses' credibility, after juror 13 mentioned recognizing Nicholson. He reaffirmed that recognizing Heisser did not affect his, or any other jurors, assessment of credibility.

Payne maintained his motion for a new trial, arguing the two most important witnesses were recognized by jurors who interjected knowledge about them into

-10-

No. 74028-8-I/11

deliberations. The trial court again declined to consider the question of juror 13 recognizing Nicholson because it had been resolved during trial. Payne did not object.

The trial court then explained:

> I really don't know how [juror 12] could have acted any differently here . . . We ask jurors if they recognize any of the witnesses in the sense of recognizing their name, or having some acquaintanceship with them. Recognizing somebody you think is from your community, it seems to me, doesn't fall with the scope of our questions. So, I also am not clear that [juror 12] engaged in any misconduct at all by not revealing information that we asked him for. I don't know how he could have known that we wanted him to tell us if he saw anybody that he might, at some other point in his life, have seen but not interacted with in any way at all. The additional thing here, too, is I really don't think there is any evidence of juror misconduct involving use of extraneous evidence, not based on the testimony that [juror 4] gave us here, certainly not based on what [juror 12] has had to say here. There is no indication here that [juror 12], for example, brought a knowledge that Mr. Heiser or some acquaintanceship with him into deliberation and shared that with other jurors, which I agree would be definite evidence of misconduct, but we don't have anything like that here. We have, at most, it seems to me, [juror 12 and 13] saying, "To the extent that we know these people,' and there is only [juror 13] who was really sure at all that she knew one of the witnesses, it had no impact on their assessment.

RP (July 24, 2015) at 422-23. Further,

> I just don't see that [juror 12] did anything wrong by thinking he recognized somebody from something that some event in his community some twenty years before this trial and indicated to other jurors that had not played in to his assessment of credibility.

RP (July 24, 2015) at 423.

After finding that juror 4's testimony was not entirely consistent and that juror 12 to be more credible, the court found Payne had not made a sufficient showing for a new trial.

Payne appeals.

-11-

## ANALYSIS

### *Right to Confrontation*

Payne argues first that the trial court's decision to prohibit cross-examination of Nguyen concerning his pending criminal charge violated Payne's Sixth Amendment right to confrontation and present a defense. Payne contends that evidence of a witnesses' bias is always admissible. But here, even if there was error, any error was harmless because the untainted evidence supports a finding of guilt beyond a reasonable doubt.

A trial court's decision to exclude evidence is generally reviewed for abuse of discretion. State v. Gunderson, 181 Wn.2d 916, 922, 337 P.3d 1090 (2014). But constitutional issues, such as claimed violations of a defendant's Sixth Amendment right to present a defense, are reviewed de novo. State v. Jones, 168 Wn.2d 713, 719, 230 P.3d 576 (2010); State v. Strizheus, 163 Wn. App. 820, 829, 262 P.3d 100 (2011).

The Sixth Amendment and due process require an accused be given a meaningful opportunity to present a complete defense. State v. Cayetano-Jaimes, 190 Wn. App. 286, 295-98, 359 P.3d 919 (2015); U.S. Const. amend. V, VI, XIV; Const. art. 1, §3, §22. In conjunction with the right to present a defense, defendants have the constitutional right to confront the witnesses against them. State v. Hudlow, 99 Wn.2d 1, 14-15, 659 P.2d 514 (1983). The primary interest secured by the confrontation clause is the right of cross-examination. Davis v. Alaska, 415 U.S. 308, 315, 94 S. Ct. 1105, 1110, 39 L. Ed. 2d 347 (1974). The defendant's right to impeach a prosecution witness with evidence of bias "is guaranteed by the constitutional right to confront

witnesses." State v. Johnson, 90 Wn. App. 54, 69, 950 P.2d 981 (1998); Davis, 415 U.S. at 316-318.[3]

In Davis, for example, the State's primary witness was a juvenile on probation. Davis, 415 U.S. at 318. The trial court denied the defense's request to question the witness about whether being on probation, or fear of becoming a suspect, may have motivated him to identify the defendant. Davis, 415 U.S. at 318. The Supreme Court reversed the conviction and remanded the case, holding, "[t]he accuracy and truthfulness of [the witness's] testimony were key elements in the State's case against petitioner" and the trial court's ruling kept defense counsel from effectively arguing "why [the witness] might have been biased or otherwise lacked that degree of impartiality expected." Davis, 415 U.S. at 317-18.

The State argues that we do not need to decide whether the trial court erred in precluding evidence of Nguyen's pending conviction, because any error was harmless. We agree. "It is well established that constitutional errors, including violations of a defendant's rights under the confrontation clause, may be so insignificant as to be harmless." State v. Guloy, 104 Wn.2d 412, 425, 705 P.2d 1182 (1985).

Constitutional error is presumed to be prejudicial and the State has the burden of proving the error was harmless. Guloy, 104 Wn.2d at 425. A constitutional error is harmless "if the appellate court is convinced beyond a reasonable doubt that any reasonable jury would have reached the same result in the absence of the error." Guloy, 104 Wn.2d at 425. We apply the "overwhelming untainted evidence test,"

---

[3] Bias refers to "the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party." United States v. Abel, 469 U.S. 45, 52, 105 S. Ct. 465, 83 L. Ed. 2d 450 (1984).

meaning we look "only at the untainted evidence to determine if the untainted evidence is so overwhelming that it necessarily lead to a finding of guilt." Guloy, 104 Wn.2d at 426.

First, unlike Davis, Nguyen's testimony was not "'a crucial link in the proof . . . of petitioner's act.'" Davis, 415 U.S. at 317 (quoting Douglas v. Alabama, 380 U.S. 415, 417, 85 S. Ct. 1074 13 L. Ed. 2d 934 (1965). Nguyen was not the sole link between the defendant and the crime. Davis, 415 U.S. at 317-18. Nguyen did not witness the shooting. Nor did he hear Nicholson's three statements to three individuals, including a police officer, that Payne was the shooter.

Second, the majority of Nguyen's testimony—that Payne was upset about the theft of his money, that Payne was present at Ballinger Homes minutes before the shooting, and that Liddell had left the area prior to the shooting—was cumulative and corroborated by other witnesses. Nicholson testified that Payne was upset about the theft and confronted him. A police officer testified that Payne contacted them to report that Nicholson and another individual were responsible for the theft of his money and property as was upset about it. Similarly Heisser testified that he had seen Payne standing outside of Le and Liddell's apartment—where Nicholson was shot.[4] Heisser also confirmed that Liddell had left the area prior to the shooting.

Finally, it bears repeating that Nicholson testified at trial that Payne was the shooter, and repeatedly and unequivocally told several witnesses right after the

---

[4] Payne argues that Heisser was unreliable because he failed to pick Payne out of a photo montage. But the trial court also studied the photo montage and remarked "Actually, I am having trouble picking out Mr. Payne from this." The court added "I have to say it would be hard for me to pick out Mr. Payne, and I have been looking at him a whole lot. The court concluded "I don't see any reason why, seeing Mr. Payne in the flesh, [Heisser] wouldn't be credible in recognizing him again here in court."

-14-

shooting that he was shot by Payne—a man he knew quite well. Even disregarding Nguyen's testimony, the untainted evidence still overwhelmingly supports the jury's finding of guilt.

## Evidence of Flight

Payne next argues the trial court erred in allowing testimony that he was arrested in California several months after the shooting. Payne alleges that this was prejudicial evidence of flight. We disagree.

Trial court decisions on the admission of evidence are reviewed for abuse of discretion. State v. Perez-Valdez, 172 Wn.2d 808, 814, 265 P.3d 853 (2011). "Such abuse occurs when, considering the purposes of the trial court's discretion, it is exercised on untenable grounds or for untenable reasons." State v. Clark, 78 Wn. App. 471, 477, 898 P.2d 854 (1995). Evidence of flight is reviewed pursuant to ER 404(b) as "other crimes, wrongs, or acts," and is reviewed for abuse of discretion. State v. Freeburg, 105 Wn. App. 492, 497, 20 P.3d 984 (2001). Evidence of flight is admissible when it creates a reasonable and substantive inference that a defendant's behavior was a reaction to a consciousness of guilt or was a deliberative effort to evade arrest. Freeburg, 105 Wn. App. at 497.

The State argues that Payne waived this issue by not objecting at the time of the testimony. We agree. Generally, when a party moves pretrial to exclude evidence and the trial court rules against them, "[u]nless the trial court indicates further objections are required when making its ruling, its decision is final, and the party losing the motion in

-15-

limine has a standing objection." State v. Kelly, 102 Wn.2d 188, 193, 685 P.2d 564 (1984).[5] However, this rule depends on the nature of the trial court's ruling,

> If the trial court has made a definite, final ruling, on the record, the parties should be entitled to rely on that ruling without again raising objections during trial. When the trial court refuses to rule, or makes only a tentative ruling subject to evidence developed at trial, the parties are under a duty to raise the issue at the appropriate time with proper objections at trial.

State v. Koloske, 100 Wn.2d 889, 896, 676 P.2d 456 (1984), overruled on other grounds by State v. Brown, 111 Wn.2d 124, 761 P.2d 588 (1988) (emphasis added). Any error is waived unless the trial court is given an opportunity to reconsider its ruling. State v. Powell, 126 Wn.2d 244, 257, 893 P.2d 615 (1995).

Here, the trial court's pretrial ruling was tentative, subject to the State presenting certain evidence at trial. Payne was clearly aware that the ruling was tentative, as Payne specifically pointed out that the nexus between Payne and Olson had not been established and asked the court to exclude evidence concerning hotels. Payne did not, however, ask the court to bar evidence that he was arrested in California, or object to the admission of the evidence at the time. Payne was required to allow the trial court the opportunity to revisit its ruling, because Payne failed to do so, the error was not preserved for appeal and has been waived.

An issue can be raised that was not properly preserved below if it is a manifest error affecting a constitutional right. RAP 2.5(a)(3). However, this issue concerns the allegedly erroneous admission of ER 404(b) evidence and evidentiary error is not of constitutional magnitude. State v. Powell, 166 Wn.2d 73, 84, 206 P.3d 321 (2009);

---

[5] "The purpose of a motion in limine is to dispose of legal matters so counsel will not be forced to make comments in the presence of the jury which might prejudice his presentation." State v. Evans, 96 Wn.2d 119, 123, 634 P.2d 845 (1981).

State v. Everybodytalksabout, 145 Wn.2d 456, 468-69, 39 P.3d 294 (2002). Nonconstitutional error in admitting ER 404(b) evidence requires reversal only if it is reasonably probable that the error materially affected the trial's outcome. Everybodytalksabout, 145 Wn.2d at 468-69.

Here, even if the court erred by not striking the testimony on its own motion, the error was harmless. The admission of evidence is harmless if that "evidence is of minor significance in reference to the overall, overwhelming evidence as a whole." State v. Bourgeois, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997). Detective Bartlett's testimony that Payne was arrested in California was the only evidence presented to the jury that could reasonably be considered "flight evidence" covered by Payne's pretrial motion. Neither party pursued this evidence, nor did the State argue that this fact created the inference that Payne fled to California after the crime. Given the overwhelming evidence that Payne shot Nicholson, the testimony that Payne was arrested in California, if erroneous, was harmless.

### Potential Juror Misconduct

Payne next argues that the trial court abused its discretion in denying his motion for a new trial based on potential misconduct by jurors 12 and 13. We disagree.

A.    Waiver

The State argues that Payne waived any claims to misconduct by juror 13 because Payne did not request further questioning of juror 13 during trial. We disagree.

While Payne's motion for a retrial was instigated by the information received after trial, that "juror 12 failed to disclose to the Court that he was personally acquainted with Patric Heisser," Payne also argued that juror 12's misconduct was "additionally

compounded" by juror 13's knowledge of Nicholson. Payne specifically cited State v. Johnson, and argued the court must consider the "'combined effects' of juror's actions and the prejudice that may ensue from related instances of misconduct." 137 Wn. App. 862, 869, 155 P.3d 183 (2007); Clerk's Papers (CP) at 66-67. RAP 2.5 exists to "afford the trial court an opportunity to rule correctly on a matter before it can be presented on appeal." State v. Strine, 176 Wn.2d 742, 749, 293 P.3d 1177 (2013). The trial court here clearly interpreted Payne's motion to include the issue of juror 13's recognition of Nicholson. The court declined to do so. Payne is making essentially the same argument on appeal, that the two jurors actions combined demonstrate misconduct requiring a retrial.

B.   The Trial Court did not Abuse its Discretion

The decision whether juror misconduct occurred and whether it affected the verdict are matters for the discretion of the trial court and will not be reversed on appeal absent an abuse of discretion. Breckenridge v. Valley Gen. Hosp., 150 Wn.2d 197, 203, 75 P.3d 944 (2003). "A trial court only abuses its discretion when its decision is manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons." Richards v. Overlake Hosp. Med. Ctr., 59 Wn. App. 266, 271, 796 P.2d 737 (1990). "A party who asserts juror misconduct bears the burden of showing it occurred." State v. Kell, 101 Wn. App. 619, 621, 5 P.3d 47 (2000). "A strong, affirmative showing of misconduct is necessary in order to overcome the policy favoring stable and certain verdicts and the secret, frank, and free discussion of evidence by the jury." State v. Balisok, 123 Wn.2d 114, 117-18, 866 P.2d 631 (1994).

"While great deference is due the trial court's determination that no prejudice occurred, greater deference is owed a decision to grant a new trial than a decision not to grant a new trial." State v. Briggs, 55 Wn. App. 44, 60, 776 P.2d 1347 (1989). "The test to determine whether the verdict may be impeached and a new trial warranted is first whether the alleged information actually constituted misconduct and, if misconduct did occur, whether it affected the verdict." Richards, 59 Wn. App. at 270. "The injection of information by a juror to fellow jurors, which is outside the recorded evidence of the trial and not subject to the protections and limitations of open court proceedings, constitutes juror misconduct." Richards, 59 Wn. App. at 270. Once the court finds misconduct, the court must make an objective inquiry into whether the extraneous evidence could have affected the jury's determination. Briggs, 55 Wn. App. at 55. "Any doubt that the misconduct affected the verdict must be resolved against the verdict." Richards, 59 Wn. App. at 273. "[A] new trial must be granted unless it can be concluded 'beyond a reasonable doubt that extrinsic evidence did not contribute to the verdict.'" United States v. Bagley, 641 F.2d 1235, 1242 (9th Cir.1981) (quoting Gibson v. Clanon, 633 F.2d 851, 855 (9th Cir. 1980)).

Payne contends that jurors 12 and 13 both failed to disclose information during voir dire, constituting misconduct. Payne does not argue that the failure to disclose alone was sufficient to demonstrate reversible misconduct.[6] Instead, Payne argues that their nondisclosure is reversible error because they withheld material information and

---

[6] To obtain a new trial based on juror nondisclosure, a party must show that the juror failed to honestly answer a material question during voir dire and that a truthful disclosure would have provided a basis for a challenge for cause. State v. Cho, 108 Wn. App. 315, 321, 30 P.3d 496 (2001). A juror's acquaintance with a party, by itself, is not grounds for a challenge for cause. See State v. Tingdale, 117 Wn.2d 595, 601, 817 P.2d 850 (1991).

then later injected that information into deliberations. Thus, this court "must inquire into the prejudicial effect of the combined, as well as the individual, aspects of the juror's misconduct." See Briggs, 55 Wn. App. at 53.

In this case, the trial court acknowledged, and the State reiterated on appeal, that most of the facts presented by juror 4 and juror 12 inhered to the verdict.[7] The only reviewable facts that could go to misconduct are that juror 13 might have stated that Nicholson was a star athlete in high school and that juror 12 may have seen Heisser in the community, possibly related to basketball.

Payne points to several cases in which the appellate court remanded for a new trial after finding juror misconduct. See Allyn v. Boe, 87 Wn. App. 722, 730-31, 943 P.2d 364 (1997); Robinson v. Safeway Stores, Inc., 113 Wn.2d 154, 158, 776 P.2d 676 (1989), Allison v. Dep't of Labor & Indus., 66 Wn.2d 263, 265, 401 P.2d 982 (1965).[8] The common theme in these cases is that the juror failed to disclose bias to the court, often intentionally, and then injected that bias into the deliberations. In this case, the record does not present any evidence that either juror falsely stated that they did not recognize the witness, or injected bias into deliberations.

---

[7] In considering an allegation of juror misconduct based on the injection of novel extrinsic evidence, the first question is whether the facts alleged "inhere in the verdict"; a question of law we review de novo. Long v. Brusco Tug & Barge, Inc., 185 Wn.2d 127, 131, 368 P.3d 478 (2016). Only once the court concludes that juror declarations allege facts constituting misconduct, rather than matters inhering in the verdict, does it proceed to decide the effect the misconduct, if any, could have had upon the jury. Long, 185 Wn.2d at 132.

[8] In Boe, the court held that a new trial was necessary because a juror failed to inform the court about her bias against an expert witness, then attacked that witness's credibility during deliberations. Boe, 87 Wn. App. at 730-31. Similarly, in Robinson, the court held that a juror's failure to disclose his bias against California residents constituted juror misconduct because the plaintiff was from California. Robinson, 113 Wn.2d at 154. Finally, in Allison, the court granted a new trial because the juror falsely stated that he could be fair and impartial. Allison, 66 Wn.2d at 265.

The record indicates that Juror 13 only recognized Nicholson when he began testifying, and she realized she had gone to the same high school. There is no evidence that she knew Nicholson personally, only by reputation. Juror 13 decided to inform the court of this connection at the time and said that she could still be impartial. Knowing this, the defense chose not to further question juror 13 regarding her disclosure, and agreed to retain her on the panel. While there is no evidence that juror 13 told the court that she had heard of Nicholson, this was an easily foreseeable possibility given that she had attended the same school. Juror 13's disclosure gave the parties an indication of her life experience and the knowledge she would bring to jury deliberations.

Juror 13 also did not insert extrinsic evidence. During deliberations, Juror 13 referred to Nicholson as a "star" and a "super athlete." Neither of these statements indicate bias, or constitutes new or novel extrinsic evidence. At trial, Nicholson testified that he played basketball in high school, and continued playing for a college team. A player on a high school team that goes on to play college basketball would presumably be an accomplished athlete and could reasonably be well-known throughout the school.

Juror 12 also did not falsely withhold information when he failed to inform the trial court that he had recognized Heisser. The trial court instructed the jurors to inform the court "if you spot someone that you know when they come in to testify,"[9] and juror 12 testified that he had never known or interacted with Heisser. Juror 12 stated only that he may have seen Heisser once or twice in the community of Central District. Such

---

[9] Emphasis added.

limited contact is not "knowing" a witness, and would likely not have caused juror 12 to assume he needed to notify the court.

Juror 12 also did not inject extrinsic evidence into the deliberations. Juror 4 testified that juror 12 might have said if Heisser had been a coach he would probably be trustworthy. Juror 12, on the other hand, specifically testified that he had not recognized Heisser as a coach. The trial court found that juror 4's testimony was inconsistent and unreliable compared to juror 12. Determinations of credibility are within the discretion of the trial court, and we defer to the trier of fact in matters of credibility. Juror 12 telling the other jurors he may have seen Heisser in the Central District as a youth was not novel extrinsic evidence, as Heisser testified directly that he grew up in Seattle's Central District.

The trial court did not abuse its discretion in denying Payne's motion for retrial based on jury misconduct.

*Cumulative Error*

Payne's final argument is that the accumulation of the errors affected the outcome in his case. Under the cumulative error doctrine, a defendant may be entitled to a new trial when cumulative errors produce a trial that is fundamentally unfair. In re Pers. Restraint of Lord, 123 Wn.2d 296, 332, 868 P.2d 835 (1994). Cumulative error may warrant reversal, even if each error standing alone would otherwise be considered harmless. State v. Greiff, 141 Wn.2d 910, 929, 10 P.3d 390 (2000). "The doctrine does not apply where the errors are few and have little or no effect on the outcome of the trial." State v. Weber, 159 Wn.2d 252, 279, 149 P.3d 646 (2006).

-22-

As discussed above, the only error Payne might have successfully alleged is the trial court's error in not permitting Payne to cross-examine Nguyen on his potential bias, and we already found that to be harmless error. Payne has not demonstrated any other errors. The cumulative error doctrine does not apply in this case.

We affirm.

_Mann, J._

WE CONCUR:

_____        _Cox, J._

FILED
COURT OF APPEALS DIV 1
STATE OF WASHINGTON
2017 OCT -9 AM 9:45